UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACIE NUSS, as Independent Administrator of the ESTATE OF CODY BRITTAIN, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NUMBER: |
| v. | § § | 3:18-cv-02192-X |
| CITY OF SEVEN POINTS, TEXAS, and CHIEF RAYMOND WENNERSTROM, JR., SERGEANT BRANDON YOUNG, OFFICER MATTHEW GREINER, OFFICER FRANCISCO GOMEZ, and CHELSEA BEE TAYLOR, in their individual capacities, | § § § § § § § § § | |
| Defendants. | | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANT OFFICER MATTHEW GREINER

## TABLE OF CONTENTS

I. Summary...........................................................2

II. Standard of Review.................................................3

III. Qualified Immunity Standard.......................................5

IV. Fourteenth Amendment Law..........................................7

V. Facts.............................................................8

VI. Application of Law to Facts......................................15

    Greiner Did Not Know of Brittain's Serious Medical Need.....................15

    Greiner Did Not Act With Deliberate Indifference..............................21

    Greiner's Actions Were Not Objectively Unreasonable..........................26

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

COMES NOW Defendant Officer Matthew Greiner ("Greiner") and files this Brief in Support of his Motion for Summary Judgment.  For same, Greiner would show as follows:

## I. Summary

1.     Stacie Nuss ("Plaintiff") is the aunt of Cody Brittain ("Brittain") and the independent administrator of Brittain's estate.  With respect to Greiner, Plaintiff has asserted a cause of action based on 42 U.S.C. § 1983.[1]  While Plaintiff does not specifically articulate which of Brittain's constitutional rights were allegedly deprived by Greiner, her First Amended Complaint references Brittain's "serious mental illness" that created "an obvious threat to harm himself."[2]  Accordingly, Plaintiff's argument is that Greiner was deliberately indifferent to Brittain's alleged serious medical needs in violation of the Fourteenth Amendment.[3]

2.     In brief, this case arises from Brittain's attempted suicide following his arrest by the City of Seven Points, Texas on a warrant out of Henderson County, Texas.  It is undisputed that, at all relevant times, Greiner was a public official for the City of Seven Points, Texas, and was acting under color of law at all pertinent times.

3.     To succeed on her claim, Plaintiff must establish that Greiner "kn[ew] of and disregard[ed] an excessive risk to [Brittain's] health or safety."[4]  Plaintiff must also establish that *no* reasonable police officer could have believed that the actions taken by Greiner were

---

[1] *See generally* Plaintiff's First Amended Complaint at ¶¶ 110-113, 120.
[2] *Id*. at ¶ 111.
[3] *See, e.g., Converse v. City of Kemah*, No. 17-41234, 2020 U.S. App. Lexis 18607, at *2 (5th Cir. Jun. 12, 2020).
[4] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

consistent with Brittain's legal rights.[5]  Because Plaintiff cannot make such a showing, summary judgment in favor of Greiner is appropriate.

## II. Standard of Review

4.     Summary judgment is appropriate if the record before the Court shows that there is no genuine issue of material fact.[6]  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise property supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact."[7]  Such a showing entitles movants to summary judgment as a matter of law.[8]  A moving party need not support its motion with affidavits or other evidence negating the non-movant's claim.[9]  The threshold inquiry is whether there are "any genuine [and material] factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[10]  "[T]he substantive law will identify which facts are material."[11]  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party on the fact issue.[12]  The burden initially is upon the moving party to identify the evidence on file in the case that demonstrates the absence of any genuine issue of material fact.[13] To prevail on a no-evidence motion for summary judgment, "the movant must merely demonstrate an *absence of evidentiary support* in the record for the non-movant's case."[14]

---

[5] *See, e.g., Graham v. Conner*, 490 U.S. 386, 397 (1989); *see also Sorenson v. Ferrie*, 134 F.3d 325, 328 (5th Cir. 1998).
[6] Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *Turner v. Houma Municipal Fire and Police Civil Service Board*, 229 F.3d 478, 482 (5th Cir. 2000).
[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).
[8] Fed. R. Civ. P. 56(c).
[9] *Celotex Corp.*, 477 U.S. at 322.
[10] *Anderson*, 477 U.S. at 251.
[11] *Id.* at 248.
[12] *Id.*; *Kipps v. Caillier*, 197 F.3d 765, 768 (5th Cir. 1999).
[13] *Celotex Corp.*, 477 U.S. at 323.
[14] *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (emphasis added).

5. Once the movant sustains this initial burden, the opposing party must then present sufficient admissible evidence to create a genuine issue of material fact.[15] The non-movant in a summary judgment proceeding may not rest upon mere conclusory allegations or denials of the pleadings – the non-movant must set forth specific facts showing a genuine issue for trial.[16]

6. Plaintiff must present more than "some metaphysical doubt as to the material facts" in order to rebut a valid motion for summary judgment.[17] In other words, Plaintiff must go beyond the pleadings and designate specific facts showing the existence of a genuine issue of material fact for trial.[18] Non-movants may not rest upon the allegations in their pleadings[19] and "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or 'only a scintilla of evidence.'"[20] Unsubstantiated assertions are not competent summary judgment evidence.[21] To fulfill her burden, Plaintiff must "identify specific facts in the record and [] articulate the precise manner in which that evidence supports [] her claim."[22] Evidence not so specified is not properly before the Court on the summary judgment proceedings.[23] Judgment is required when a party fails to establish the existence of an essential element of his case on which that party will bear the burden of proof at trial.[24] On this record, Plaintiff cannot establish the essential elements of her claim against Greiner because Greiner is entitled to qualified immunity.

---

[15] *Id*. at 322-325.

[16] *Id.*; Fed. R. Civ. P. 56(e). *See also Lujan v. National Wildfire Fed'n*, 497 U.S. 871, 888 (1990); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Hightower v. Texas Hosp. Assn.*, 65 F.3d 443, 447 (5th Cir. 1995); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) *cert denied* 413 U.S. 871 (1994) (non-movant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].").

[17] *Matsushita Elec. Indus. Co. v. The Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[18] *Id.*

[19] *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir. 1988) *cert denied* 488 U.S. 926 (1988).

[20] *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *Miller v. Graham*, 477 Fed. Appx 549, 551 (5th Cir. 2011); *Douglass*, 79 F.3d at 1429.

[21] *Little*, 37 F.3d at 1537; *Forsyth* 19 F.3d at 1533.

[22] *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 445, 458 (5th Cir. 1998); *Forsyth*, 19 F.3d at 1537.

[23] *Ragas*, 136 F.3d at 458.

[24] *Celotex Corp.*, 477 U.S. at 322-324.

4

### III. Qualified Immunity Standard

7.      "The doctrine of qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[25]  The plaintiff has the burden of refuting a properly raised qualified immunity defense[26] "by establishing that the official's allegedly wrongful conduct violated clearly established law."[27]  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law."[28]

8.      To determine whether a public official is entitled to qualified immunity, the Court conducts a two-step analysis.[29]  The usual approach is to determine, first, "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights."[30]  If such a violation occurred, then the Court "consider[s] whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[31]  "This requirement establishes a high bar."[32]  This is a demanding standard because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[33]  For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."[34]  Although a case

---

[25] *Pearson v. Callahan*, 555 U.S. 223, 231(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[26] A qualified-immunity defense alters the summary-judgment burden: "[o]nce a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available".  *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

[27] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (quotations and citation omitted); *Wyatt v. Fletcher*, 718 F.3d 496, 502 (5th Cir. 2013) (plaintiff has the burden of demonstrating that the defendant official is not entitled to qualified immunity).

[28] *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quotations and citations omitted).

[29] *Saucier v. Katz*, 533 U.S. 194, 200-02 (2001)

[30] *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).

[31] *Id.* at 411.

[32] *Wyatt,* 718 F.3d at 503.

[33] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[34] *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

5

directly on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.[35] "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather, the inquiry must focus on whether a right is clearly established as to the specific facts of the case."[36] Although the existence of the right is often considered first, it is permissible for a Court to begin with the determination of whether the claimed right was clearly established: "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case."[37]

9.      It is Plaintiff who bears the burden of proof on the issue of qualified immunity.[38] Accordingly, Plaintiff must present facts which, if true, establish that *no* reasonable official in the shoes of Greiner could have believed that the actions taken by Greiner, *in the circumstances confronting Greiner*, were consistent with the pleaded legal rights.[39]  If reasonable officials could differ on the legality of Greiner's actions, then qualified immunity is a bar to liability and to suit.[40]   With regard to the interplay between the Fourteenth Amendment's subjective standard and qualified immunity's objective standard, the Fifth Circuit has stated that:

> The sometimes confusing relationship between . . . qualified immunity's "objective reasonableness" standard and the Fourteenth Amendment's "subjective deliberate indifference" standard . . . has been distilled as follows: "We are to determine whether, in light of the facts as viewed in the light most favorable to

---

[35] *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc).

[36] *Vincent v. City of Sulphur,* 805 F.3d 543, p.8 (5th Cir. 2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

[37] *Pearson*, 555 U.S. at 242.

[38] *Brumfield,* 551 F.3d at 326.; *Estate of Davis v. City of North Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) (*quoting Roberts v. City of Shreveport*, 397 F.3d 287, 291 (5th Cir. 2005)).

[39] *See, e.g., Graham v. Conner*, 490 U.S. 386 (1989); *see also Sorenson v. Ferrie*, 134 F.3d 325 (5th Cir. 1998).

[40] *Pfannsteil v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990).

the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard."[41]

This record does not contain sufficient evidence to establish circumstances which would overcome the qualified immunity of Greiner.  Furthermore, the evidence presented by Greiner establishes that a reasonable officer in his shoes could have believed that his actions were lawful and consistent with the preservation of the Brittain's right to receive attention for serious medical needs.  Therefore, Plaintiff's claims herein are barred by qualified immunity.

## IV.  Fourteenth Amendment Law

10.     The crux of Plaintiff's claim is an allegation that Brittain died due to inattention to medical needs.  The Fifth Circuit has "repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide."[42]  "[I]t is well-settled law that jail officials violate this right if 'they [(1)] gained actual knowledge of the substantial risk of suicide *and* [(2)] responded with deliberate indifference.'"[43]

11.     With regard to the knowledge requirement, "[a] prison official will not be held liable if he merely 'should have known' of a risk; instead, to satisfy this high standard, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*'"[44]  Then, with regard to the deliberate indifference requirement, "[a]n official shows deliberate indifference to [the known] risk 'by failing to take reasonable measures to abate it.'"[45]

---

[41] *Converse*, 2020 U.S. App. Lexis 18607 at *7-8 (quoting *Jacobs v W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000)).
[42]  *Id*. at*6 (citing *Jacobs*, 228 F.3d at 393 and *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996)).
[43] *Id.* (quoting *Hare*, 74 F.3d at 650) (emphasis added).
[44] *Id.* at *8 (quoting *Farmer*, 511 U.S. at 837) (emphasis added).
[45] *Id.* (quoting *Hare*, 74 F.3d at 648) (emphasis added).

12.     In order to present a cognizable claim under this theory and support an inference of deliberate indifference, Plaintiff must present facts which establish that Greiner "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."[46]   Specifically, Greiner "must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], *and* he must also [have drawn] the inference."[47]   Mere negligence is insufficient to meet the standard.[48]   This record does not contain sufficient evidence to establish that Greiner violated the Brittain's rights under the Fourteenth Amendment.   Specifically, the record does not show that Greiner knew that Brittain had an alleged serious medical need or that Greiner acted with deliberate indifference to that alleged serious medical need.

## V. Facts

Testimony of Defendant Matthew Greiner:[49]

13.     Greiner is currently employed as an Allstate insurance agent in Plano, Texas.   He previously attended, and graduated from, the Eastfield College Law Enforcement Academy in 2010.   Greiner was subsequently employed by the City of Seven Points, Texas as both a reserve police officer and a full-time police officer.   On the date of the incident involving Brittain, Greiner was on-duty as a full-time police officer for the City of Seven Points, Texas.   He continues to hold his peace officer's license with the Texas Commission on Law Enforcement ("TCOLE") and is currently serving as a police officer for Trinity Valley Community College Police Department.   Greiner has a total of 1290 in training and education hours with TCOLE.

---

[46] *Farmer,* 511 U.S. at 837.
[47] *Id.* (emphasis added).
[48] *Hare*, 74 F.3d at 643.
[49] Each paragraph below is cited to the corresponding paragraph in the Affidavit of Matthew Greiner (Appendix pages 1 to 4).

Greiner has always met or exceeded the law enforcement training and education requirements set by TCOLE.[50]

14.     On October 18, 2016, at approximately 6:00 p.m., Greiner reported for duty at the Seven Points Police Department to work a twelve (12) hour shift.   Upon entering the Police Department, he observed that Officer Francisco Gomez was in the process of booking in an arrested person.   That person was Brittain.   Officer Gomez informed Greiner that Brittain was being booked on a warrant out of Henderson County, Texas.   This is the first time Greiner ever remembers meeting Brittain.[51]

15.     Greiner overheard Officer Gomez asking the standard book-in question for an arrestee. These book-in questions include asking an arrestee whether he/she is sick or under a doctor's care; whether the arrestee had taken any pills, injections or was intoxicated; whether the arrestee had any physical defects; whether the arrestee had any current or prior medical problems; and whether the arrestee had recently been injured.   The arrestee is also asked whether he/she has any of the following medical conditions: asthma, heart trouble, hypertension, hepatitis A, B or C, drug addiction, alcoholism, mental illness, diabetes, venereal disease, tuberculosis, scabies, suicidal tendencies, seizures, HIV/AIDS and epilepsy.   This list of medical conditions that the booking officer is required to ask is posted at the book-in area.   A photograph of the posted medical conditions at the book-in area is attached to Greiner's affidavit as Exhibit A-1.[52]

16.     When Officer Gomez started asking the book-in questions, Greiner recalls that Brittain was acting out and being a little difficult, but that was not at all unusual for an arrestee.   Greiner recalls Brittain saying at first that he had "head problems" and was "messed up in the head" or

---

[50] *See* Appx. p. 1-2, ¶2.
[51] *See* Appx. p. 2, ¶3.
[52] *See* Appx. p. 2 (¶4) and 5.

words to that effect.   Greiner had no idea what Brittain was referring to from these statements. Officer Gomez was being very patient with Brittain.   Officer Gomez calmed Brittain down and asked him all the book-in questions.   Brittain answered all the book-in questions "no", including to all the medical conditions questions and to the "suicidal tendencies" question.[53]

17.      Near the conclusion of the book-in process, Officer Gomez allowed Brittain to make a phone call.   Greiner recalls Brittain saying that he was going to call his counselor at the House of Benjamin.   Greiner does not recall if Officer Gomez was in proximity to know who, or hear who, Brittain was calling.   At that time, Greiner had not heard of the House of Benjamin and knew nothing about it.   After the book-in process, Officer Gomez told Greiner that he thought Brittain was possibly on drugs because his eye pupils were pinpoints.   This was nothing unusual because individuals on drugs are frequently arrested and put in jail.   This also rationalized, in Greiner's mind, why Brittain was acting out and being a little difficult.[54]

18.      Since Officer Gomez was going off duty, and also since the night shift officer (which was Greiner) was responsible offering inmates the opportunity to shower, Greiner asked Brittain if he wanted to shower.   Brittain told Greiner that he wanted to shower.   Greiner then began to gather soap, shampoo, deodorant and towel to give to Brittain, and escorted Brittain to the shower area. Once at the shower area, Brittain then told Greiner he had changed his mind and no longer wanted to shower.[55]

19.      Greiner then escorted Brittain to the south cell at the Police Department and gave him a jail uniform, a blanket, a mat and a water cup.   Brittain then changed into the jail uniform and Greiner placed him in the south cell and locked the door.   Before Greiner left the cell area,

---

[53] *See* Appx. p. 2, ¶5.
[54] *See* Appx. p. 2, ¶6.
[55] *See* Appx. p. 2, ¶7.

Brittain asked Greiner if he could call his counselor at the House of Benjamin again.   Because Greiner believed that he had just talked to his counselor on the phone at the House of Benjamin, Greiner declined his second request.   Brittain did not seem upset that he could not make the second phone call.   Greiner then prepared for patrol and left the Police Department building to patrol the City of Seven Points.   Before Greiner left the building to go on patrol, Greiner knew of no facts and did not believe, or even think, that Brittain had suicidal tendencies or was in any way contemplating suicide.   Greiner certainly did not draw the inference that Brittain was at risk of suicide.[56]

20.     Not long after leaving the Police Department, Greiner received a call from the Police Department dispatcher, Chelsea Bee-Taylor.   Ms. Taylor told Greiner that Brittain was acting rowdy by yelling and waiving his shirt around and throwing things from his jail cell.   Greiner then called Sgt. Brandon Young and reported what he had been told by Ms. Taylor.   Sgt. Young was the supervisor on duty at that time.   Sgt. Young informed Greiner that he would proceed to the Police Department to handle the situation.   Greiner decided to also go to the Police Department in the event Sgt. Young would need any assistance.[57]

21.     When Greiner arrived at the Police Department, Sgt. Young was at the south cell and was talking to Brittain.   Sgt. Young was being very cordial and professional with Brittain.   Greiner heard Brittain say that he wanted to talk to his counselor at the House of Benjamin again.   Sgt. Young agreed and allowed Brittain to make a phone call to the House of Benjamin.   Greiner doesn't recall how long the phone call lasted, but Brittain was allowed to fully complete the phone call.   Greiner didn't listen to the phone call. When Sgt. Young placed Brittain back in the jail cell, Sgt. Young informed Brittain that if he needed to talk to an officer, that he should

---

[56] *See* Appx. p. 3, ¶8.
[57] *See* Appx. p. 3, ¶9.

politely and calmly ask the dispatcher.[58]

22.     During the evening of October 18, 2016, before midnight, Greiner came back to the
Police Department several times.   Even though the dispatcher was frequently checking on
Brittain, Greiner would walk back to the jail cell area and check on him as well.   The dispatcher
was keeping a written log on her checks of Brittain, a true and correct copy is attached as Exhibit
A-2 to Greiner's affidavit. Each time Greiner observed Brittain, he was fine and not in any kind
of distress.   It should be noted that the log sheet[59] has an incorrect starting date of October 17,
2016.   The log sheet should have a start date of October 18, 2016.[60]

23.     After midnight, Greiner was at the Police Department and checked on Brittain again.
This time, Greiner wrote on the log at 12:32 a.m. on October 19, 2016, that Brittain was "sitting
on floor awake, said he's fine".   Greiner then left the Police Department.   Before Greiner left
the building, Greiner knew of no facts and did not believe, or even think, that Brittain had
suicidal tendencies or was in any way contemplating suicide.   Greiner certainly did not draw the
inference that Brittain was at risk of suicide.[61]

24.     Earlier in the evening while on patrol, Greiner had responded to an assault family
violence call in the City of Seven Points, Texas.   After leaving the Police Department after
midnight on October 19, 2016, Greiner drove to Eustace, Texas to conduct a follow up interview
of the victim of the family assault case.   Eustace, Texas is approximately a twenty (20) minute
drive from the City of Seven Points, Texas.   While in Eustace, Greiner received a phone call
from Ms. Taylor, the dispatcher.   As Greiner recalls the conversation, Ms. Taylor said that she
was going to call the Tool Police Department to come to the Seven Points Police Department to

---

[58] *See* Appx. p. 3, ¶10.
[59] *See* Appx. p. 6.
[60] *See* Appx. p. 3, ¶11.
[61] *See* Appx. p. 3, ¶12.

check on Brittain because he was threatening to harm himself.  This was the first time Greiner was ever made aware that Brittain had done anything or said anything about harming himself. Greiner believed that he heard Ms. Taylor say that Brittain said he was going to "hang" himself. Sgt. Young had already gone off duty by this time.[62]

25.     Greiner agreed with Ms. Taylor to immediately call the Tool Police Department because the City of Tool was only a couple minutes away from the City of Seven Points Police Department and whereas Greiner was twenty (20) minutes away.  The City of Tool, Texas and the City of Seven Points, Texas had a mutual aid agreement in place.[63]

26.     Next, Greiner received a phone call from Sgt. Young who informed him that Brittain had attempted to hang himself in the jail cell.   Greiner then left the City of Eustace and drove to the City of Seven Points Police Department.  Upon arrival, Greiner observed an ambulance parked behind Seven Points Police Department.  Greiner entered the Police Department and observed emergency medical personnel performing medical care on Brittain.  Emergency medical personnel then placed Brittain on a stretcher and placed him in the ambulance.  Greiner rode in the ambulance with Brittain to the hospital.  Later, Greiner drafted a report of what happened that night.  A true and correct copy of his report is attached[64] to Greiner's affidavit.  At no time during his interactions with Brittain did Greiner know of any facts, or even believe or even think, that Brittain had suicidal tendencies or was in any way contemplating suicide.  Greiner certainly did not draw the inference the Brittain was at risk of suicide.[65]

---

[62] *See* Appx. p. 4, ¶13
[63] *See* Appx. p. 4, ¶14
[64] *See* Appx. p. 7-8.
[65] *See* Appx. p. 4, ¶¶15-16.

Testimony of Plaintiff Stacie Nuss

27.     Plaintiff is the aunt and the only relative Brittain had at the time of his passing.[66] Plaintiff raised Brittain since the age of five years old and was his legal guardian.[67] From the age of at least thirteen (13), Brittain had been diagnosed with depression, bi-polar disorder and possibly schizophrenia.[68]  Plaintiff stated that Brittain had a "*lot of stuff going on in his head*."[69] As a result, Brittain experienced moods swings, crying and became withdrawn.[70]  Brittain started receiving treatment from the Behavioral Health Center at age thirteen (13).[71]  Brittain was also a "street drug" user.[72]  Approximately two weeks before his arrest on October 18, 2016, Brittain voluntarily checked in to the House of Benjamin.[73]  The House of Benjamin is a "rehab facility to help people better themselves."[74]

28.     Despite Brittain's years of reported mental health issues and street drug use and despite Brittain's residency at the House of Benjamin, Plaintiff testified that she *never* observed anything, and *never* heard anything, that made her feel like Brittain had the potential to commit suicide.[75] Brittain *never* threatened to commit suicide, *never* threatened to harm himself, and *never* demonstrated suicidal tendencies.[76]  In fact, Plaintiff testified to the opposite - that Brittain was scared of death.[77]

---

[66] *See* Appx. p. 14.
[67] *See* Appx. p. 15.
[68] *See* Appx. p. 17, 20, 21, 22, 26-27.
[69] *See* Appx. p. 17 (emphasis added)
[70] *See* Appx. p. 23-24.
[71] *See* Appx. p. 25.
[72] *See* Appx. p. 18-19, 20, 28, 32-33.
[73] *See* Appx. p. 16-17, 34.
[74] *See* Appx. p. 16-17, 34.
[75] *See* Appx. p. 30.
[76] *See* Appx. p. 29-30.
[77] *See* Appx. p. 31.

## VI.  Application of Law to Facts

29.     In order to survive summary judgment, Plaintiff must present some evidence that Greiner violated the Brittain's constitution rights.  To make such a showing, Plaintiff must establish that Greiner knew that Brittain had a serious medical need *and* that Greiner acted with deliberate indifference to that serious medical need.  *If* Plaintiff is able to establish that Greiner violated the Brittain's constitutional rights, then in order to proceed with her claim, she must overcome Greiner's claim of qualified immunity by showing that that Greiner's actions were objectively unreasonable in light of the circumstances.  As discussed herein, Greiner is entitled to summary judgment because:

> (1) Plaintiff has not (and cannot) establish that Greiner knew that the Brittain had a serious medical need,
>
> (2) Plaintiff has not (and cannot) established that Greiner acted with deliberate indifference to that serious medical need, and
>
> (3) Plaintiff has not (and cannot) establish that Greiner's actions were objectively unreasonable in light of the circumstances.

Greiner Did Not Know of Brittain's Serious Medical Need

30.     The record establishes that Greiner did not know that Brittain had a serious medical need. During Greiner's initial encounter with Brittain, he observed Brittain being booked in by Officer Gomez.  While Brittain was initially a little difficult, this was nothing unusual for an arrestee.[78] Greiner observed Brittain calm down and then answer all the medical related questions "no", including the "suicidal tendencies" question.[79]   While Greiner did overhear Brittain say something about "head problems" and being "messed up in the head," Greiner did not know

---

[78] *See* Appx. p. 2, ¶5.
[79] *See* Appx. p. 2, ¶5.

what Brittain meant by these statements.[80]   And, from these statements alone, an inference cannot be drawn of a medical need – let alone a *serious* medical need.   Indeed, "[p]olice are not psychiatrists, and even psychiatrists cannot necessarily distinguish between a mental illness or handicap on one hand and drug-induced or simply obnoxious behavior on the other" in a short span of time.[81]

31.      During the remainder of the evening and night, there was nothing in the encounters between Greiner and Brittain that would indicate Brittain had a serious medical need.   When Greiner escorted Brittain back to the shower area, and subsequently to the holding cell, nothing was unusual or indicative of a serious medical need.[82]   When Greiner returned to the Police Department to assist Sgt. Young, he observed Sgt. Young and Brittain having a calm conversation.[83]   He also was aware that Brittain was given the opportunity to call his counselor at the House of Benjamin.[84]   There was nothing about this encounter that was unusual or indicative of Brittain having a serious medical need.[85]   Throughout the remainder of the evening and night, Greiner observed Brittain in the holding cell several times.[86]   Brittain was always fine and in no distress.[87]   At 12:32 a.m. on October 19, 2016, Greiner checked on Brittain in the holding cell and noted on the log that Brittain was "sitting on floor awake, said he's fine."[88]   To be liable for a constitutional violation, Greiner needed to not only be aware of facts that create an inference of

---

[80] *See* Appx. p. 2, ¶5.
[81] *Barlow v. Owens*, 400 F. Supp. 2d 980, 984 (S.D. Tex. 2005).
[82]   *See* Appx. p. 2-3, ¶¶7-8.
[83]   *See* Appx. p. 3, ¶10.
[84]   *See* Appx. p. 2-3, ¶¶6-10.
[85]   *See* Appx. p. 3, ¶¶9-10.
[86]   *See* Appx. p. 3, ¶¶11-12.
[87]   *See* Appx. p. 3, ¶11.
[88]   *See* Appx. p. 3 (¶5) and 6.

16

a serious medical need, he also *must have drawn the inference.*[89]   Until receiving the phone call

from Dispatcher Taylor, while he was 20 minutes away in Eustace, Texas, Greiner, at no time,

was presented with facts that made him think or believe that Brittain was suicidal, and Greiner

never drew that inference.[90]

32.   In *Posey v. Southwestern Bell Tel. L.P.*,[91] Posey was arrested for assault/family

violence.[92]   During booking, Posey was questioned regarding his mental health, but Posey did

not alert the jail officials to any mental health issues.[93]   Posey was assessed by a nurse and

placed in a cell.[94]   The nurse noted that Posey should be observed and that he should see a

psychiatrist for his anger problems.[95]   From the cell, Posey called his mother.[96]   After his mother

complained about the call, Posey was moved to another cell with a non-working phone.[97]   Posey

used the cord of the non-functional telephone to hang himself.[98]   When he was discovered, a jail

nurse performed CPR on Posey.[99]   Posey was transported to a hospital, where he was pronounced

dead.[100]

33.   Posey's parents brought suit under 42 U.S.C. § 1983, claiming that the county violated

Posey's constitutional rights.[101]   Posey's parents claimed that Posey was "'irrational, under the

influence of drugs and hostile' and this was evidence that he was a suicidal risk."[102]   In granting

---

[89] *Farmer*, 511 U.S. at 837.
[90] *See* Appx. p. 4, ¶¶13-16.
[91] 430 F. Supp. 2d 616 (N.D. Tex. 2006).
[92] *Id*. at 618.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.* at 618-19.
[97] *Id.* at 619.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*

the county's motion for summary judgment, the district court noted that Posey's parents had "not demonstrated that the County employees had subjective knowledge of a substantial risk of serious harm to Posey regarding his medical needs or safety."[103]   The court noted that "[a]nger, hostility, and belligerence are not uncommon displays of conduct by pretrial detainees or other persons held in custody."[104]   "Based on the medical and psychological evaluation of Posey by jail personnel, there was insufficient evidence that he would commit suicide."[105]

34.     As in *Posey*, there was insufficient evidence that Brittain had any suicidal tendencies at all.  Like Posey, Brittain did not alert Greiner of any mental health issues or indicate any suicidal tendencies.[106]   While Posey was examined by a nurse, Brittain was able to talk to his counselor on two occasions.[107]   The record does not reflect that the counselor at any time alerted Greiner as to any threat of suicide posed by Brittain.   Indeed, each time Greiner observed Brittain, "he was fine and not in any kind of distress."[108]   While, at one point in the evening, Greiner was advised that Brittain was "acting rowdy by yelling and waiting his shirt around and throwing things from his jail cell,"[109] anger, hostility, and belligerence, themselves, do not create a subjective knowledge of a substantial risk of serious harm.[110]   Furthermore, Brittain's comments that he was "messed up in the head" during the book-in process are insufficient to create a subjective knowledge of a substantial risk of serious harm.  Indeed, Plaintiff testified that Brittain had a "lot of stuff going on in his head."[111]   However, she testified that Brittain *never* threatened to commit

---

[103]  *Id*. at 622-23.
[104]  *Id*. at 623.
[105]  *Id.*
[106]  *See* Appx. p. 3, ¶¶8-12.
[107]  *See* Appx. p. 2-3, ¶¶6-10.
[108]  *See* Appx. p. 3, ¶11.
[109]  *See* Appx. p. 3, ¶9.
[110]  *Posey,* 430 F. Supp. 2d at 622-23.
[111]  *See* Appx. p. 17.

suicide, *never* threatened to harm himself, and *never* demonstrated suicidal tendencies.[112]  In fact, according to Plaintiff, Brittain was scared of death.[113]

35.    If Plaintiff, the person who raised Brittain and was closest to Brittain, never drew an inference that Brittain had suicidal, how could Greiner draw such an inference based on his limited personal interaction with Greiner – particularly when, during each such interaction, Brittain, "was fine and not in any kind of distress."[114]  Each and every interaction Greiner had with Brittain was non-evident of a serious medical need.  Accordingly, Greiner did not have the requisite "subjective knowledge of a substantial risk of serious harm."

36.    In *Garza v. City of Donna*[115], Garza was arrested for assault after police were summoned by Garza's mother in response to Garza's intoxicated and argumentative behavior.[116]  Garza's mother said that she notified the arresting officer that she believed Garza might hurt himself.[117]  During booking, the arresting officer testified that Garza was "okay" and that there was no indication that Garza wanted to harm himself.[118]  Accordingly, no mental screening was requested for Garza.[119]  After being placed in his cell, a jailer noted that Garza was making noises and "intermittently hitting and kicking the metal mesh screening of his jail cell door with the palms of his hands, and sometimes with his feet."[120]  A little over half an hour later, Garza was discovered hanging in his cell.[121]

---

[112] *See* Appx. p. 29-30.
[113] *See* Appx. p. 31.
[114] *See* Appx. p. 3, ¶11.
[115] *No. 7:16-cv-00558,* 2017 U.S. Dist. Lexis 206958 (S.D. Tex. Dec. 18, 2017) affirmed by 922 F.3d 626.
[116] *Id.* at *3-4.
[117] *Id.* at *3.
[118] *Id.* at *4.
[119] *Id.* at *4-5.
[120] *Id.* at *8.
[121] *Id.*

37.     Garza's parents brought suit under 42 U.S.C. § 1983, claiming that the Garza's rights under the Fourteenth Amendment were violated.[122]  In considering the actions of the arresting officer, the court noted that Garza's mother never explained why she believed that Garza might hurt himself[123] and that Garza never gave the arresting officer any indication that he wanted to harm himself.[124]  The court found that "[o]n the whole, the evidence suggests [the arresting officer] was – subjectively speaking – focused on detaining a rowdy and potentially violent intoxicated person, rather than saving a suicide-prone subject."[125]  The court concluded that

> it is not possible to infer from the available evidence that [the arresting officer] was subjectively aware of 'a substantial risk of harm' to [Garza] or that [the arresting officer] actually drew an inference that [Garza] would kill himself.  [The arresting officer] specifically stated that he did not draw any such inference.[126]

In considering the actions of the jailer, the court noted the lack of evidence that the jailer "was subjectively aware of facts from which he could reasonable infer a substantial risk that [Garza] was about to kill himself."[127]  The court noted that

> [the jailer] had no basis for believe [Garza] was suicidal, except for [Garza's] noise-making.  However, the mere fact that [Garza] was intermittently hitting the metal mesh of his cell door is not an obvious sign that he was about to *kill* himself – as opposed to simply being angry, intoxicated, bored, trying to get attention, or some combination of these or other issues.[128]

According, the court granted summary judgment with respect to the asserted Fourteenth Amendment claim.[129]

---

[122] *Id*. at *1, *11.
[123] *Id*. at *18.
[124] *Id*. at *19.
[125] *Id*.
[126] *Id*. (citing *Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016).
[127] *Id*. at *25.
[128] *Id*. at *25-26 (emphasis in original).
[129] *Id*. at 47.

38.     Here, like the arresting officer in *Garza*, Greiner's observations of Brittain showed that Brittain was "fine and not in any kind of distress."[130]   While Greiner was told about Brittain's "rowdy" behavior, this behavior alone is not sufficient to create a subjective awareness of a substantial risk of harm.[131]   Further, like the arresting officer in *Garza*, it is undisputed that Greiner did not draw the inference and was not subjectively aware of any medical need – serious or otherwise.[132]   Indeed, as in *Garza*, there was no basis to believe Brittain was suicidal.

39.     There is no evidence that Greiner was subjectively aware of a serious medical need of Brittains.   In fact, it is undisputed that Greiner knew of no facts and did not believe, or even think, that Brittain had suicidal tendencies or was in any way contemplating suicide.   And, it is undisputed that Greiner did not draw the inference that Brittain was at risk of suicide.   Accordingly, Plaintiff has not (and cannot) establish that Greiner knew that the Brittain had a serious medical need.   Therefore, summary judgment in favor of Greiner is appropriate.

Greiner Did Not Act With Deliberate Indifference

40.     Since Greiner was not aware of a serious medical need of Brittain, it follows that Greiner *could not act* with deliberate indifference to that serious medical need.   Yet, even if Greiner had been aware of the serious medical need (which is denied), the record does not reflect that he acted with deliberate indifference with respect to that need.   The record shows that Greiner checked on Brittain throughout the night[133], that Brittain was twice allowed to call his

---

[130]   *See* Appx. p. 3, ¶11.
[131]   *Garza*, 2017 U.S. Dist. Lexis 206958 at *19, *25-26.
[132]   *See* Appx. p. 3-4, ¶¶8, 12,16.
[133]   *See* Appx. p. 3, ¶¶11-12.

counselor[134], and that Greiner directed the dispatcher to obtain assistance in the quickest manner possible (from Tool Police Department) at the first sign that Brittain intended to harm himself.[135]

41.     In *Sanchez v. Young Cty.*[136], a wife struggled with depression and told her husband that, if she were to attempt suicide, she would withdraw cash from an ATM, check into a motel, and then overdose on pills.[137]  When the husband noticed a cash withdrawal and was unable to locate his wife, he notified various law enforcement agencies that his wife was missing and that she was at risk for suicide.[138]  When a police officer found the wife asleep in her vehicle, he noted that her speech was slurred, that she responded slowly, and that she had a hard time keeping her eyes open.[139]  The wife was examined by a medic.[140]  She admitted to taking a "substantial" amount of medication, but answered "no" when asked whether she was trying to harm herself.[141] The wife refused to go to the hospital, so the officer arrested her for public intoxication.[142] During intake, the wife indicated she was "negative" for behavior or conditions indicative of suicide.[143]  After the husband discovered that his wife had been arrested, he contacted the police station and told them that she was a suicide risk, but he did not specifically mention his concerns regarding overdose.[144]  When he later called again and "begged" that his wife be taken to a hospital, the husband was informed that his wife "was just drunk and needed to sleep it off."[145]

---

[134] *See* Appx. p. 2-3, ¶¶6, 10.
[135] *See* Appx. p. 4, ¶13.
[136] 886 F.3d 274 (5th Cir. 2017).
[137] *Id.* at 276.
[138] *Id.* at 277.
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.* at 277-78.
[143] *Id.*
[144] *Id.*
[145] *Id.*

Later, the wife was discovered unresponsive in her cell.[146]   An autopsy identified the cause of death as mixed drug intoxication, and the manner of death was found to be consistent with suicide.[147]

42.     The Fifth Circuit found that the wife's "treatment by the employees of the County did not indicate subjective deliberate indifference."[148]   The Court noted that "[d]eliberate indifference is an extremely high standard to meet."[149]   While the "individual actions may have amounted to negligence, even gross negligence, [it was] not sufficient to create a genuine issue of material fact concerning deliberate indifference . . . ."[150]

43.     In *Sanchez*, the officials were presented with numerous facts related to the well-being of the wife, including the wife's intoxicated behavior, the wife's admission to ingesting "substantial" amounts of medication, and the husband's alert to the risk of suicide.   Despite these warning signs, the Fifth Circuit found that the officials were not deliberatively indifferent by leaving the wife in her cell.   Here, Greiner had *no* knowledge of a risk to the well-being of Brittain.   Brittain said that he had no suicidal tendencies[151], and each time Greiner personally observed Brittain, he was "fine and not in any kind of distress."[152]   Despite this, rather than simply being relegated to his cell like the wife in *Sanchez*, Brittain was given opportunities to talk to his counselor[153] and was frequently checked during the night[154].   As in *Sanchez*, these facts do not meet the "extremely high standard" of deliberate indifference.

---

[146]   *Id.*
[147]   *Id.*
[148]   *Id.* at 280.
[149]   *Id.*
[150]   *Id.*
[151]   *See* Appx. p. 2, ¶5.
[152]   *See* Appx. p. 3, ¶11.
[153]   *See* Appx. p. 2-3, ¶¶6, 10.
[154]   *See* Appx. p. 3, ¶¶11-12.

44.     In *In re Estate of Pollard v. Hood County*,[155] Pollard was charged with aggravated sexual

assault of a child.[156]  After learning of the impending charges, Pollard twice attempted suicide.[157]

One his release from the hospital from his second attempt, he was arrested.[158]  Pollard was

classified as a "high risk for suicide", placed in a cell with only a mattress, and "placed on 15-

minute watch, meaning the jailers would visually check on his every fifteen minutes."[159]  The

jailers waited eighteen minutes between visual checks on one occasion, and during that time,

Pollard was able to hang himself using a laundry bag "left in the cell by a previous inmate and

overlooked when the cell was cleaned."[160]

45.     Summary judgment was granted to the individual defendants on the basis of qualified

immunity.[161]  The Fifth Circuit noted:

> [T]o defeat a defendant's summary judgment premised upon qualified immunity,
> a plaintiff must produce evidence that presents a genuine issue of material fact
> that (1) the defendants' conduct amounts to a violation of the plaintiff's
> constitutional right; and (2) the defendants' actions were 'objectively
> unreasonable in light of clearly established law at the time of the conduct in
> question."  A conclusion that Plaintiff has failed to establish either prong may
> resolve the inquiry.  Here, because we find that Plaintiff has not established a
> genuine issue of material fact that the defendants violated Pollard's constitutional
> rights, we do not address the defendants' objective reasonableness in light of
> clearly established law.[162]

The Fifth Circuit further noted that the constitutional violation in question was the Due Process

clause of the Fourteenth Amendment, under which an inmate has a right not to be denied, by

---

[155] 579 Fed. Appx. 260 (5th Cir. 2014).
[156] *Id.* 262.
[157] *Id*.
[158] *Id.*
[159] *Id.*
[160] *Id.* at 263.
[161] *Id*.
[162] *Id.* at 265 (quoting *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012)) (internal citations omitted).

deliberate indifference, attention to his serious medical needs.[163]   To establish such deliberate indifference, the plaintiff was required to show that the officials "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."[164]

46.     The Court stated that the jailer's failure to conduct a visual check on the 15-minute mark did "not raise a genuine issue of material fact that [the jailers] deliberately ignored an excessive risk of harm to Pollard's safety."[165]   Indeed, the Court noted that "negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the state."[166]   Furthermore, with regard to the overlooked laundry bag, the Court noted that the jailers "had no knowledge of the laundry bag that Pollard used to hang himself.   Therefore, at most, their failure to view and retrieve the bag was negligent, and does not amount to a knowing disregard of a serious health risk."[167]

47.     Unlike *Pollard*, Greiner had no reason to know that the Brittain was suicidal.   Even if he had known (which is denied), Greiner's actions do not amount to a "knowing disregard of a serious health risk."   The record shows that Greiner checked on Brittain throughout the night[168], that Brittain was twice allowed to call his counselor[169], and that Greiner directed the dispatcher to obtain assistance in the quickest manner possible (from the Tool Police Department) at the first sign that Brittain intended to harm himself.[170]

---

[163] *Id.*
[164] *Id.* (quoting *Farmer*, 511 U.S. at 837).
[165] *Id*. at 265.
[166] *Id*. (quoting *Hare*, 74 F.3d at 645).
[167] *Id.*
[168] *See* Appx. p. 3, ¶¶11-12.
[169] *See* Appx. p. 2-3, ¶¶6, 10.
[170] *See* Appx. p. 4, ¶13.

48.     There is no evidence that Greiner was deliberately indifferent to a serious medical need of Brittains.  In fact, the evidence shows that Greiner personally checked on Brittain throughout the night and quickly sought to get Brittain aid at the first sign of any concern.  Accordingly, Plaintiff has not (and cannot) established that Greiner acted with deliberate indifference to that serious medical need.  Therefore, summary judgment in favor of Greiner is appropriate.

<u>Greiner's Actions Were Not Objectively Unreasonable</u>

49.     Even if Plaintiff were able to establish that Brittain had a serious medical need of which Greiner was subjectively aware *and* that Greiner acted with deliberate indifference to that serious medical need (both of which are denied), Greiner is still entitled to summary judgment on the basis of qualified immunity *unless* Plaintiff can show that all reasonable police officers in the same situation as Greiner would have known that Greiner's acts violated the United States Constitution.[171]

50.     In *Thompson v. Upshur County*, Thompson was arrested in Upshur County for DWI and transferred to the neighboring Marion County pursuant to an agreement between the counties.[172]  A few days after his arrest, Thompson began to suffer from delirium tremens (DTs).[173]   An ambulance was called, and the EMTs advised Thompson that he was experiencing DTs and that injuries or death could result.[174]   The EMTs urged Thompson to go to the hospital, but Thompson refused.[175]  Thompson signed a refusal of medical treatment.[176]  Concerns were raised over whether, in such a state, Thompson was able to effectively refuse medical treatment.[177]

---

[171] *Thompson v. Upshur County*, 245 F.3d 447, 460 (5th Cir. 2001).
[172] *Id*. at 452.
[173] *Id*.
[174] *Id*. at 453.
[175] *Id*.
[176] *Id.*
[177] *Id.*

There was evidence that Marion County Sheriff Tefteller was aware of the events in Thompson's case as they occurred.[178]   Eventually, Thompson was transferred back to Upshur County, as that jail was equipped with a special "detox" cell.[179]   There, Thompson began to have seizures.[180] When he stopped breathing, he was taken to the hospital, where he was pronounced dead.[181]   An autopsy listed the cause of death to be the result of DTs.[182]

51.     Thompson's parents sued Sheriff Tefteller (among others) alleging violations of Thompson's rights under the Fourteenth Amendment.[183]   Sheriff Tefteller's motion for summary judgment on the basis of qualified immunity was denied.[184]   While the Fifth Circuit stated that the plaintiffs had "allege[d], at a high level of generality, a constitutional violation[, i]t remain[ed] whether [Tefteller's] acts were objectively reasonable in light of clearly established law."[185]   The Fifth Circuit explained that "[e]xamples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and, therefore, are relevant in determining whether the defendants' actions were objectively reasonable."[186]   To withstand Sheriff Tefteller's motion for summary judgment, the plaintiffs had to establish that Thompson had:

> a clearly established constitutional right to have his jailers at the smaller county either force him to submit to medical care for his DTs against his clearly communicated refusal to do so, or make reasonable efforts to locate a substitute decision maker, in lieu of promptly returning him to the custody of the larger

---

[178] *Id.*
[179] *Id.*
[180] *Id.* at 454.
[181] *Id.*
[182] *Id.*
[183] *Id.* at 454-55.
[184] *Id.* at 455.
[185] *Id.* at 459.
[186] *Id.* at 459-60.

27

county's jail from which he was transferred and which ha[d] detoxification facilities the smaller county's jail lack[ed].[187]

While the Fifth Circuit found that "clearly established law prevents a jailer from responding to a serious medical need with deliberate indifference," it was not clearly established that a jailer "must force a conscious, incompetent, but clearly refusing inmate to undergo medical treatment or seek a surrogate decision-maker for the same."[188]  In finding that Sheriff Tefteller was entitled to qualified immunity, the Fifth Circuit noted that, "[g]iven the absence of even a single case constitutionally requiring the imposition of medical care or location of a surrogate in this or any similar context, if cannot be said that *all* reasonable sheriffs would recognize the unconstitutionality of Tefteller's supervisory or personal acts or omissions."[189]

52.     The Fifth Circuit recently made clear the standard for qualified immunity for a Fourteenth Amendment claim:

> The sometimes confusing relationship between . . . qualified immunity's "objective reasonableness" standard and the Fourteenth Amendment's "subjective deliberate indifference" standard . . . has been distilled as follows: "We are to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard."[190]

53.     Here, viewing all the evidence in a light most favorable to the Plaintiff, Plaintiff cannot demonstrate that *all* reasonable police officers would recognize the alleged unconstitutionality of Greiner's personal acts or omissions.  To the contrary, Greiner acted as a reasonable officer by checking on Brittain repeatedly[191] – which was more than the officers offered the wife in *Sanchez* or the inmates in *Posey* and *Garza*.  Throughout the evening and night, Greiner

---

[187]  *Id*. at 460
[188]  *Id.*
[189]  *Id*. at 461 (emphasis added).
[190]  *Converse*, 2020 U.S. App. Lexis at *7-8 (quoting *Jacobs*, 228 F.3d at 394).
[191]  *See* Appx. p. 3, ¶¶11-12.

observed Brittain in the holding cell several times.[192]   Brittain was always fine and in no

distress.[193]   At 12:32 a.m. on October 19, 2016, Greiner checked on Brittain in the holding cell

and noted on the log that Brittain was "sitting on floor awake, said he's fine."[194] There was

nothing in the encounters between Greiner and Brittain that would indicate Greiner acted

unreasonably.  Further, and while in Eustace, Texas, and upon hearing of Brittain threat to harm

himself, Greiner acted as a reasonable officer by getting help from the closest source – the Tool

Police Department.  Plaintiff has not and cannot establish that Greiner's actions were objectively

unreasonable in light of the circumstances.  As such, Greiner is entitled to qualified immunity.

## VII.  Conclusion

In conclusion, in order to survive summary judgment, Plaintiff must present some

evidence that (1) Greiner was subjectively aware of a serious medical need of Brittain's, (2)

Greiner acted with deliberate indifference to that serious medical need, and (3) Greiner's actions

were objectively unreasonable in light of the circumstances.  Plaintiff cannot show that Greiner

knew of a serious medical need of Brittain's.  Plaintiff cannot show that Greiner acted with

deliberate indifference to a serious medical need of Brittain's.  And, Plaintiff cannot show that

Greiner's actions were objectively unreasonable in light of the circumstances.   According,

Greiner is entitled to judgment in his favor as a matter of law.

---

[192] *See* Appx. p. 3, ¶¶11-12.
[193] *See* Appx. p. 3, ¶11.
[194] *See* Appx. p. 3, (¶12) and 6..

Respectfully submitted,

**BOON CALK ECHOLS COLEMAN & GOOLSBY, PLLC**
1800 W. Loop 281, Suite 303
Longview, Texas 75604
(903) 759-2200-telephone
(903) 759-3306-facsimile
Email: darren.coleman@boonlaw.com

BY: *Darren K. Coleman*
        DARREN K. COLEMAN
        SBN: 04558570
        Attorney-in-Charge

***ATTORNEYS FOR DEFENDANT***
***MATTHEW GREINER***


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all counsel of record via electronic mail on this the 29th day of June 2020.

*Darren K. Coleman*
DARREN K. COLEMAN

30

## **TABLE OF AUTHORITIES**

### **Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Barlow v. Owens*, 400 F. Supp. 2d 980 (S.D. Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brumfield v. Hollins*, 551 F.3d 322 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 ,6

*Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Converse v. City of Kemah*, No. 17-41234, 2020 U.S. App. Lexis 18607

(5th Cir. Jun. 12, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 28

*Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 3, 4

*Estate of Davis v. City of North Richland Hills*, 406 F.3d 375 (5th Cir. 2005) . . . . . . . . . . . . . . 6

*Estate of Pollard v. Hood County,* 579 Fed. Appx. 260 (5th Cir. 2014) . . . . . . . . . . . . . . . . 24, 25

*Farmer v. Brennan*, 511 U.S. 825 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8

*Freeman v. Gore*, 483 F.3d 404 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Forsyth v. Barr*, 19 F.3d 1527 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Garza v. City of Donna*, No. 7:16-cv-00558, 2017 U.S. Dist. Lexis 206958

(S.D. Tex. Dec. 18, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Graham v. Conner*, 490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,6

*Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hightower v. Texas Hosp. Assn.*, 65 F.3d 443 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 4

*Kipps v. Caillier*, 197 F.3d 765 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kovacic v. Villarreal*, 628 F.3d 209 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lujan v. National Wildfire Fed'n*, 497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Malley v. Briggs*, 475 U.S. 335 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Matsushita Elec. Indus. Co. v. The Zenith Radio Corp.*, 475 U.S. 574 (1986). . . . . . . . . . . . . . . 4

*Miller v. Graham*, 477 Fed. Appx. 549 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Pearson v. Callahan*, 555 U.S. 223 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Pfannsteil v. City of Marion*, 918 F.2d 1178 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Posey v. Southwestern Bell Tel. L.P.*, 430 F. Supp. 2d 616 (N.D. Tex. 2006) . . . . . . . . . . . 17-18

*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 445 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . 4

*Sanchez v. Young Cty*, 886 F.3d 274 (5th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Saucier v. Katz*, 533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sorenson v. Ferrie*, 134 F.3d 325 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,6

*Stanton v. Sims*, 571 U.S. 3 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 26-28

*Turner v. Houma Municipal Fire and Police Civil Service Board*,

229 F.3d 478 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Vincent v. City of Sulphur,* 805 F.3d 543 (5th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**<u>Rules</u>**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4