## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **STACIE NUSS, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF CODY BRITTAIN,** | § § § § | |
| *Plaintiff,* | § § | |
| | § | **CIVIL ACTION NO. 3:18-CV-02192-X** |
| vs. | § § | |
| **CITY OF SEVEN POINTS, TEXAS, and CHIEF RAYMOND WENNERSTROM, JR., SERGEANT BRANDON YOUNG, OFFICER MATTHEW GREINER OFFICER FRANCISCO GOMEZ, and CHELSEA BEE TAYLOR, in their Individual capacities,** | § § § § § § § § | |
| *Defendants.* | § | |

### BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### (Traditional and No Evidence Motion for Summary Judgment)

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COME NOW** Defendants the City of Seven Points, Texas, ("City of Seven Points" or "City"), Chief Raymond Wennerstrom, Jr., Sergeant Brandon Young, Officer Francisco Gomez, and Chelsea Bee-Taylor,, and file this their Brief in Support of Defendants' Motion for Summary Judgment.  In support of its motion for summary judgment,  Defendants would respectfully show the Court the following:

## TABLE OF CONTENTS

I.      Summary………………………………...………………………………………………2

II.     Standard of Review……………….…………………………………………………...4

III.    Qualified Immunity Standard……………….………………………………….......5

IV.     Fourteenth Amendment Claim……………………………………………………...7

V.      Facts………………………..……………………………………………………………9

VI.     Application of Law to Facts………………………………………………………..18

VII.    Requirements of A Municipal Liability Claim……………………………………27

VIII    Conclusion……………………………………………………………..........46

IX.     Prayer…………………………………………………………………………………47

X.      Table of Authorities……………………………………………………………..49

## I.
## SUMMARY

1.      The Plaintiff, Stacie Nuss, is the aunt of Cody Brittain ("Brittain"), and the Independent Administrator of Brittain's Estate.  The Plaintiff has asserted causes of action against all Defendants named herein for violation of Brittain's constitutional rights under 42 U.S.C. § 1983.  More specifically, Plaintiff has stated claims against Defendants City of Seven Points, Police Chief Raymond Wennerstrom, Sergeant Brandon Young, Officer Francisco Gomez, and Dispatcher Chelsea Bee-Taylor for deliberate indifference to Brittain's alleged serious medical needs in violation of the Fourteenth Amendment.  (See Plaintiff's First Amended Complaint).

2.      On the afternoon of October 18, 2016 Brittain was arrested by Seven Points Police Officer Francisco Gomez after he received a report of Brittain wandering around an apartment property.  Brittain was wanted on a confirmed warrant out of Henderson County.  He was scheduled to be

held in the Seven Points, Texas jail ("holding facility"), waiting to be picked up by Henderson County Sheriff's deputies and transferred to the Henderson County Jail.  Several hours after his arrest he attempted to commit suicide by hanging himself unexpectedly with his jail shirt.  He was revived when CPR was started by Seven Points and City of Tool personnel, and was continued by EMT's who transferred him to East Texas Medical Center.

3.      It is not disputed that at all times, Defendants Wennerstrom, Young, Gomez, and Bee-Taylor were public officials and employees of the City of Seven Points, Texas.  Each of them was acting under color of State law in their interactions with Brittain.

4.      In order to establish her claim, Plaintiff must prove that each of the Defendants "knew of and disregarded an excessive risk to [Brittain's] health or safety."  *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (emphasis added).  Plaintiff must also establish that *no* reasonable officer could have believed that the actions taken by these Defendants, individually, were consistent with Brittain's legal rights.  *Graham v. Conner,* 490 U.S. 386 (1989).

5.      The evidence in the record of this case does not establish these needed facts with regard to Plaintiff's Fourteenth Amendment Claim on behalf of Brittain.  Accordingly, summary judgment is appropriate for each of the Defendants Wennerstrom, Young, Gomez, and Bee-Taylor.

6.      Defendant City is not liable for the claims brought by Plaintiff under the Americans with Disabilities Administration Act and/or Rehabilitation Act because Defendant City did not fail, or refuse, to accommodate a disability of Brittain's as alleged.  Moreover, Plaintiff cannot show that Brittain claimed that he suffered from a disability, or that he requested an accommodation of any type from Defendant City of Seven Points personnel.  Accordingly, summary judgment is proper for Defendant City on this cause of action as well.

## II.

## **STANDARD OF REVIEW**

1.      The purpose of summary judgment is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Summary judgment is authorized if the movant establishes that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ.Pro.* 56(c). Facts are considered "material" if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A material fact creates a "genuine issue" if the evidence is such that the trier of fact reasonably could resolve the factual dispute in favor of either party. *Anderson,* 477 U.S. at 249. "[T]he substantive law will identify which facts are material." *Id.* at 248. The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23. The burden initially is upon the moving party to identify the evidence on file in the case that demonstrates the absence of any genuine issue of material fact. To prevail on a no-evidence motion for summary judgment, "the movant must merely demonstrate an *absence of evidentiary support* in the record for the non-movant's case." *Douglas v. United Servs. Auto Association,* 79 F. 3d 1415, 1429 (5th Cir. 1996) (emphasis added).

2.      If the party moving for summary judgment meets the initial burden, Rule 56(c) requires the non-movant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist which create a genuine issue for trial. *Little v. Liquid Air Corp.,* 37 F. 3d 1069, 1075 (5th Cir. 1994). The party opposing summary judgment is required to identify specific evidence in the record and to

articulate the precise manner in which that evidence supports the party's claim. *Forsyth v. Barr,* 19 F. 3d 1527, 1537 (5th Cir. 1994).

3.      Plaintiff must present more than "some metaphysical doubt as to the material facts" in order to rebut a valid motion for summary judgment. *Matsushita Elec. Indus. Co. v. the Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Unsupported allegations or affidavits or deposition of testimony asserting ultimate or conclusory facts and conclusions of law are not sufficient to defeat a motion for summary judgment. *Duffy v. Leading Edge Products,* 44 F. 3d 308, 312 (5th Cir. 1995) (citing *Anderson,* 447 U.S. at 247). The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart,* 486 F. 3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux* v. *Swift Transp. Co.,* 402 F. 3d 536, 540 (5th Cir. 2005). Judgment is required when a party fails to establish the existence of an essential element of his case on which that party will bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322-324.

## III.
## QUALIFIED IMMUNITY STANDARD

1.      "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" A good-faith qualified immunity defense alters the usual summary judgment burden of proof. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly

incompetent or those who knowingly violate the law." *Stanton v. Sims,* 134 S. Ct. 3, 5 (2013).  "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis." *Griggs v. Brewer,* 841 F. 3d 308, 312 (5ᵗʰ Cir. 2016); *Luna v. Mullenix,* 773 F. 3d 712, 718 (5ᵗʰ Cir. 2014).  "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right."  *Id.* (citing *Tolan v. Cotton,* 572 U.S. 650, 655-65 (2104)).  "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id. (*quoting *Flores v. City of Palacios,* 381 F. 3d 391, 395 (5ᵗʰ Cir. 2004)).  "This requirement establishes a high bar." *Wyatt v. Fletcher,* 718 F. 3d 496, 502 (5ᵗʰ Cir. 2013).  This is a demanding standard because qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

2.      "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Lytle v. Bexar County,* 56 F. 3d 404, 410 (5ᵗʰ Cir. 2009) (quotations omitted).  When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that "every reasonable official would understand that what he is doing violates [the law]."  *Morgan v. Swanson,* 659 F. 3d 359, 371-72 (5ᵗʰ Cir. 2011) (*en banc*) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)).  Although a case directly on point is not necessary, there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitely unlawful.  *Id.*  "If officers of a reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact."  *Id.* (quoting *Tarver v. Edna,* 410 at 750.)  "A court has discretion to decide which prong to consider first."  *Whitley v. Hanna,* 726 F.

3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).  Although the existence of the right is often considered first, it is permissible for a court to begin with the determination of whether the claimed right was clearly established: "The judges of the district courts and the courts of appeal are in the best position to determine the order of decision making that will best facilitate the fair and efficient disposition of each case."  *Pearson,* 555 U.S. at 242.

3.      It is the plaintiff who bears the burden of proof on the issue of qualified immunity.  Accordingly, Plaintiff must present facts which, if true, establish that no reasonable official in the shoes of each of the Defendants Gomez, Young, Wennerstrom, and Bee-Taylor could have believed that the actions which each of them took individually, were consistent with the pleaded legal rights.  "Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently."  *Luna,* 773 F. 3d at 718.  Each of the individual Defendant's conduct should be considered individually, and not collectively.  If reasonable officials could differ on the legality of the actions taken by the actions of any of the individual Officers, then qualified immunity is a bar to liability and to suit.  *Pfannsteil v. City of Marion,* 918 F. 2d 1178, 1183 (5th Cir. 1990).  The evidence in the record presented by the Plaintiff is not sufficient to overcome the qualified immunity of any of the Defendants Gomez, Young, Wennerstrom, or Bee-Taylor.  Furthermore, each of these Defendants have presented evidence which establishes that a reasonable officer (or dispatcher) in his/her shoes could have believed that his/her actions were lawful and consistent with the preservation of Brittain's right to receive attention for serious medical needs.  Therefore, Plaintiff's claims herein against each individual Defendant are barred by qualified immunity.

**IV.**

**FOURTEENTH AMENDMENT CLAIM**

1.      The focus of Plaintiff's claim is an allegation that Brittain died due to inattention to medical needs.  The Fifth Circuit has "repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide."  *Converse v. Kemah,* 2020 U.S. App. LEXIS 18607 at \*6 (*Jacobs v. W. Feliciana Sheriff's Dep't,* 228 F. 3d 388, 393 (5th Cir. 2000) and *Hare v. City of Corinth, Miss.,* 74 F. 3d 633, 643 (5th Cir. 1996) (*en banc*)).  It is well-settled law that jail officials violate this right if "they [(1)] gained actual knowledge of the substantial risk of suicide *and* [(2)] responded with deliberate indifference."  *Id.* (quoting *Hare,* 74 F. 3d at 650) (emphasis added).

2.      With regard to the knowledge requirement, "a prison official will not be held liable if he merely 'should have known' of a risk; instead, to satisfy this high standard, a prison official 'must both be aware of facts from which the inference would be drawn that a substantial risk of serious harm exists, and *he must also draw the inference.*'"  *Id.* at \*8 (quoting *Farmer,* 511 U.S. at 837) (emphasis added).  Then, with regard to the deliberate indifference requirement, "[an] official shows deliberate indifference to [the known risk 'by failing to take reasonable measures to update it.'" *Id.* (quoting *Hare,* 74 F. 3d at 648) (emphasis added).

3.      The Fifth Circuit has stated that:

> "The sometimes confusing relationship between… qualified immunity's 'objective reasonableness' standard and the Fourteenth Amendment's 'subjective deliberate indifference' standard… has been distilled as follows:  "We are to determine whether, in light of the facts as viewed in the light most favorable to the plaintiffs, the conduct of the individual Defendants was objectively unreasonable when applied against the deliberate indifference standard."  *Id.* at \*7-8 (quoting *Jacobs,* 228 F.3d at 394).

4.      In order to present a cognizable claim under this theory and support an inference of deliberate indifference, Plaintiff must present facts which establish that these Defendants, Gomez, Young, Wennerstrom, and Bee-Taylor, "knew-of and disregarded an excessive risk to inmate health or safety."  Specifically, each of them "must both [have been] aware of facts from which

the inference could be drawn that a substantial risk of serious harm existed, and each of them must independently have also drawn that inference.  *Id.* (emphasis added).  Mere negligence is insufficient to meet the standard.  *Hare,* 74 F. 3d at 643.  As for each of the individual City Defendants, Gomez, Young, Wennerstrom, and Bee-Taylor, this record does not contain sufficient evidence to establish that any of them violated Brittain's rights under the Fourteenth Amendment. More specifically, the record does not show that either Defendant Gomez, Defendant Young, Defendant Wennerstrom, or Defendant Bee-Taylor knew that Brittain had a serious medical need, or that any of them independently acted with deliberate indifference to any such medical need.

## V.

## FACTS

1.     Testimony of Defendant Francisco Gomez.     Officer Francisco Gomez is the first officer to have contact with Cody Brittain on October 18, 2016 when he was on patrol.  He received a call across the radio advising all police officers in the area that a report had been made that Cody Brittain, who was wanted on an arrest warrant out of Henderson County, had been seen walking around a local apartment complex.  He immediately drove to that location, and identified an individual who he thought was Mr. Brittain. (App. 1) Sergeant Young was also present parked in front of the apartment complex.  He spoke to Mr. Brittain, and he was not resistant or evasive.  He spoke with Mr. Brittain and he asked if he could smoke a cigarette before he was transported to the jail.  However, Officer Gomez advised him that he could not.  Sergeant Young joined them at Officer Gomez' location, and spoke briefly with Mr. Brittain.  Sergeant Young provided him with a bottle of water before he was transported, and asked him to locate his backpack.  However, Brittain advised him that he had lost it in the woods.  Officer Gomez transported him to the Seven Points jail and booked him into custody without any incidents.  He does not consider the Seven Points PD holding cells to be a jail. (App. 1) He has served as a Peace Officer for approximately

thirteen (13) years, and continues to hold his Peace Officers License with the Texas Commission on Law Enforcement ("TCOLE") and is currently serving as a Police Officer for Trinity Valley College Police Department.  Officer Gomez previously served as a TCOLE licensed and certified jailer with the Henderson County Sheriff's Office for eight (8) years.  Officer Gomez knows the appropriate and required questions to ask someone who is being booked-in to the county jail, including the medical questions.  (App. 1).

2.      When booking someone into the City holding cells, he only follows the City of Seven Points City Policy, but asks the same medical questions that he was trained to ask when he worked with the county jail.  He questioned Cody Brittain as he booked him into the holding facility. Officer Gomez asked him the same medical questions that he would have asked him at the Henderson County jail.  When he asked Brittain each time whether he suffered from a particular medical issue such as general hypertension, heart issues, HIV, epilepsy, drug addiction, alcoholism, mental illness, diabetes, venereal disease, tuberculosis, Cody Brittain answered "no" to each of these questions.  He also asked if he had ever had "suicidal tendencies." Again, Brittain answered, "no." Officer Gomez does not recall that Cody Brittain had any problems answering his questions, and made no statements concerning him being "messed up in his head."  Gomez never was of the opinion that Cody Brittain was on drugs.

3.      Officer Gomez concluded the book-in process for Cody Brittain, and concluded placing him in the cell.  Officer Gomez does not recall observing anything in Brittain that caused him to suspect that Brittain had suicidal tendencies.  (App. 1).

4.      <u>Testimony of Defendant Brandon Young.</u>  Sergeant Brandon Young is currently employed with the Trinity Valley Community College as a fulltime police officer.  He continues to hold his TCOLE (Texas Commission on Law Enforcement) License which was originally issued to him in 2011 after he attended Police Academy.  He had originally started work at the Henderson County

Jail, and was placed as fulltime police officer while in the jail to work security. He was promoted to the rank of Sergeant while at the Henderson County Jail. He left that job to go to work for the City of Seven Points Police Department as an Investigator. (App. 2) After working in that position for over a year, he stepped down and rejoined patrol. At the time of the incident involving Cody Brittain, Defendant Young held the position of Sergeant. In 2017 he left the City of Seven Points to join the Trinity Valley Community College Police Department where he currently works fulltime. Sergeant Young previously worked for the Henderson County Jail for approximately five (5) years.

5.      Sergeant Young was familiar with the "booking" process, and had done book-in at the Henderson County Jail when working there. He received his Basic Jailer's License by attending training at Kilgore Police Academy. He has also attended supplemental suicide prevention classes while at Henderson County Jail. These consisted of eight hour courses each year. On October 18, 2016 when Brittain was arrested, Sergeant Young was at the scene. He was on patrol at the time that the radio call was made, and he met Officer Gomez at the site where Brittain was arrested. They were each driving separate vehicles. Officer Gomez was the one who actually made the arrest, and transported him to jail. However, he did talk to Brittain before he was taken to the jail. While Brittain was sitting in Officer's Gomez' vehicle, Sergeant Young had an opportunity to speak with him. Sergeant Young gave him a bottle of water, and had a brief  conversation with Brittain. (App. 2) He observed nothing that caused him alarm, or that caused him to think that Brittain was suffering from a medical emergency, was in medical need, or that he was intoxicated to a point that he was unable to control himself. In fact, Sergeant Young asked Brittain if he was "high" before they left the scene, and he answered that "he was not." (App. 2) If they had detected a medical problem, or been told that he was having "head problems," he would have been given an immediate  medical release to a medical facility. Gomez took Brittain to the Seven Points

Police Department for book-in, and placed him in the jail cell area.  Sergeant Young was not present for book-in.  He was not told by any of the officers that Brittain was having "head problems" or that he was "messed up in the head."  Cody Brittain never made such a statement to him.  (App. 3, pg. 101).

6.      After completing his paperwork, Sergeant Young went back out on patrol.   At approximately 6:30 p.m. he was contacted by the dispatcher, Chelsea Bee-Taylor, who advised him that Brittain had requested to speak to the Sergeant.  Sergeant Young responded immediately by returning to the police station to speak with Brittain.  He observed that Brittain had thrown his trash can, and his meal and caused a "mess" in his cell area.  Sergeant Young patiently spoke with Brittain, and Brittain told him that he wanted someone to talk to.  (App. 3, pg. 111).  Sergeant Young allowed Brittain to clean up his cell, and Brittain then apologized.  Sergeant Young then allowed Brittain to place a call to his "counselor" at the local House of Benjamin.  Sergeant Young allowed Brittain to complete his private telephone call to his counselor "Rachel."  However, in response to a request, Sergeant Young spoke with Rachel before ending the call. (App. 3 p. 118). She advised Sergeant Young that she had observed some symptoms of possible mental illness in Brittain, but did not mention any medical or mental issues which posed a substantial risk of serious harm.  Sergeant Young advised that Brittain would be picked up the following morning from Seven Points Jail for transport to the Henderson County Jail, and would be seen there by the medical staff.  (App. 3 p. 119) Rachel did not state to Sergeant Young that more immediate treatment was necessary, or otherwise show that examination at Henderson County Jail the next morning was unsatisfactory.  After concluding the phone call with the counselor Rachel, Brittain was returned to his cell.  At no time during Sergeant Young's interaction with Brittain did he say or do anything which indicated to Sergeant Young that he had any intent to harm himself, injure himself, or commit suicide.  (App. 3, pg. 122-123).

7.     Later that evening Sergeant Young made another arrest while again on patrol.  Because of the conduct of that detainee, he had no other option than to transport him immediately to the Henderson County Jail for transfer.  His shift ended, and he went off duty at midnight on January 18, 2016, the date of Brittain's arrest.  He received no further contacts or information Brittain during the remainder of his shift.  (App. 2)

8.     At approximately 1:54 a.m. on October 19 the dispatcher contacted Sergeant Young and advised him that Brittain had moments ago threatened to "bang his head on the wall." (App. 3, p. 127) Chelsea Bee-Taylor had also advised him that she had already contacted the nearby Tool Police Department for immediate assistance.  Tool was only two to three miles from Seven Points, and the two police departments frequently assisted one another.  Sergeant Young advised her to tell the Tool officer to take Brittain out of the cell immediately, and handcuff him to the book-in bench where the dispatcher could watch him all of the time until someone from the county sheriff's department could pick him up.  (App. 3 p. 127) After Sergeant Young concluded the call with Chelsea Bee-Taylor, he immediately contacted Henderson County Dispatch to request an immediate pickup of Brittain.  He made the call to Henderson County Dispatch and they advised that they would call him back after they contacted a deputy to see if one could come right over. (App. 3, pg. 131).

9.     Immediately following the conclusion of my call with Henderson County Dispatch, Sergeant Young received a second call from Ms. Bee-Taylor at 2:06 to tell him that Brittain had hung himself.  Officer Matthew Foster arrived immediately following the first call and was present when Brittain was found.  (App. 3, pg. 130, l32).  According to Sergeant Young, Ms. Bee-Taylor had advised him that Brittain had repeatedly asked for a cigarette throughout the night, and the reason that he threatened to "bang his head on the wall" was because he wanted a cigarette and Ms. Bee-Taylor told him she wasn't going to give him one.  She had contacted an EMS unit, and

a unit had arrived to transport Brittain to a local medical facility. Officer Foster had already started CPR on Brittain. (App. 3 p. 146.)

10.     <u>Testimony of Defendant Chelsea Bee-Taylor.</u>   Defendant Chelsea Bee-Taylor was the dispatcher at the time that Brittain was detained in the Seven Points Jail.  She was primarily responsible for watching Brittain's activities in his cell that evening, and alerting any of the officers to his requests, or notable behavior.  Although she was in the dispatch area, she could see the cell area by television monitor, and maintained regular personal checks on Brittain (App. 5).  She could hear comments, noise, or unusual sounds made by Brittain from where she sat at the dispatcher's desk.  She maintained a log sheet where she recorded the respective times that she made personal visual checks on Brittain, and also recorded her observations on each occasion.  (App. 5).

11.     At no time prior to this threat to bang his head against the bars or wall did Ms. Bee-Taylor ever hear, or otherwise know, of a threat by Brittain to harm himself.  At one other time prior to that at 22:49 he was lying on the floor and slapping his hands to make some noise.  However, when she spoke with him he did not threaten to commit any violent acts, and did not threaten to hurt himself.  He showed no sign that he was physically ill, needed medical care, or was at any other substantial medical risk.  At approximately 00:10 she checked on him and personally observed that he was awake and lying down.  He was not disruptive, threatening, or violent.  She certainly observed nothing about him from which she drew the inference that a substantial risk of serious harm existed.  She also observed nothing to give her knowledge that he presented a substantial risk of suicide.

12.     Officer Greiner, also a Defendant, was present to check on Brittain at approximately 00:32 on 10-19-16, and advised Ms. Bee-Taylor that Brittain was sitting on the floor awake, but was not acting in a wild or uncontrolled manner.

13.    For the first time, at approximately 01:43 on 10-19-16, Brittain started talking loudly and shaking the doors to his cell.  Ms. Bee-Taylor personally checked on him, and asked him what was wrong.  He advised her that he "couldn't take it anymore that he needed a cigarette." (App. 5) She told him that he could not have a cigarette, and that it was against the policy to smoke inside the building.  At that time, Brittain made his first threat to bash his head in the cell door and to get blood everywhere.  She encouraged him to relax and try to get some sleep.  He also hung his blanket up on his cell door to block the view.  She told him to please take the blanket down.  She never observed Brittain strike his head against the cell door, or otherwise injure himself at that time.  She immediately went to call the nearest available police officer for assistance.  She was aware that Officer Greiner had left the facility to follow up on a call, and was several miles away.  She therefore chose to contact the nearby Tool Police Dispatch and request immediate assistance.  Tool and Seven Points are adjoining cities, and have a mutual assistance agreement in place.  Tool Officer Matthew Foster arrived at the Seven Points Jail within eight (8) minutes of the call.  Immediately after making the call to the Tool Dispatch, Ms. Bee-Taylor contacted Sergeant Young, who was the commanding officer that evening, but had taken an arrestee to the Henderson County Jail earlier.  He had recently gone off duty and returned to his home.  He immediately approved of her actions, and made a follow-up phone call to the Henderson County Jail to request that they provide transport for an immediate transfer of Brittain from Seven Points to the Henderson County Jail.

14.    As soon as Officer Foster arrived from Tool at Seven Points, he made a trip to the bathroom inside the police building.  He then made an immediate trip, accompanied by Ms. Bee-Taylor to check on Brittain.  It was then that they found Brittain had hung himself.

15.    At that point Ms. Bee-Taylor opened the cell door and Officer Foster immediately took Brittain down, and began to administer CPR.  Ms. Bee-Taylor called for immediate medical

assistance.  VFD Captain Bobby Conn and his wife walked into the police facility for an unrelated reason, and immediately joined in administering CPR.  Within a few minutes they were joined at the jail facility by an EMS unit from East Texas Medical Center, and the paramedics took over the administration of the CPR, and a pulse was restored.  (App. 5).

16.    <u>Testimony of Defendant Chief Raymond Wennerstrom</u>.    Chief Raymond Wennerstrom was not on duty on October 18, 2016 when Brittain was arrested, and had no personal contact with Brittain on October 18 or 19 when he was in custody.  Chief Wennerstrom worked earlier that day, and had completed an 8 a.m. to 5 p.m. shift (08:00 – 17:00 shift).   Although he may have stayed for a while following his shift, he does not recall seeing Brittain at any time at the police facility.  (App. 6).

17.    When Chief Wennerstrom left the Seven Points police building, he left Sergeant Young on-duty and serving as the supervising officer.  Officer Gomez was in the process of completing his shift, and it was anticipated that Officer Greiner would report for duty shortly before Officer Gomez completed his shift.

18.    Chief Wennerstrom was not contacted during the evening of October 18, 2016 by Sergeant Young, or any other representative of the Seven Points Police Department to advise him of the arrest of Brittain, or to further advise him of any specific problems with Brittain.  He was not advised of any medical needs, medical problems, or concerns regarding a substantial risk of serious harm with Brittain.  Likewise, Chief Wennerstrom received no information from any source informing him that a substantial risk of suicide existed with Brittain.  In fact, there is no evidence in the record establishing that Chief Wennerstrom even had knowledge that Brittain was in the custody of the Seven Points Police Department during the evening of October 18, 2016.  (App. 6)

19.    The first information that Chief Wennerstrom had regarding Brittain was received by telephone call from Sergeant Young at approximately 01:54, according to his recollection.

Sergeant Young advised Chief Wennerstrom that Brittain had threatened to bang his head on the cell, and that he was placing his blanket on the jail cell so that no one could see him.  Sergeant Young also advised him that he was in Athens at the Henderson County Jail building transferring custody of another arrestee whose behavior had required him to make an immediate transfer, and that Officer Greiner had been called out to follow-up on a domestic call from earlier.  Accordingly, he and dispatcher Bee-Taylor had agreed  to contact the Tool Police Department for immediate assistance.  Tool is an adjoining City, and the officers frequently assist one another.  The intent was to move Brittain out of his cell, and handcuff him to the bench in the book-in area. Wennerstrom was further advised that Tool Police Officer Matt Foster was already in route to Seven Points.  Sergeant Young also advised him that he would immediately call Henderson County Dispatch and request an immediate transfer of custody to the Henderson County Jail for Brittain. (App. 6).

20.     Promptly following the receipt of the initial phone call, Wennerstrom received a second phone call from Sergeant Young advising him that shortly after arrival Officer Foster and Ms. Bee-Taylor had found Brittain hanging by his shirt from the top bunk of the bed.  Officer Foster, assisted by VFD Chief Bobby Conn, promptly removed Brittain from the hanging position and administered CPR.  Wennerstrom was advised that as soon as Ms. Bee-Taylor observed Brittain in the cell, she immediately contacted East Texas Medical Center EMS for assistance. Wennerstrom immediately advised Sergeant Young that he was in route to the Seven Points Police Department.  (App. 6).  At no point did Chief Wennerstrom play a personal role in the custody or care of Brittain during this incident.  He never observed or was made aware of anything to make him suspect, or infer, that Brittain had suicidal tendencies, or that he was subject to a substantial risk of serious medical need or harm.  The record does not indicate that Chief Wennerstrom was actively involved in Brittain's custody or care during this incident, and observed no indication of

a serious medical need or of a suicidal tendency.  Since he was not aware of any serious medical need, substantial risk of harm, or suicidal tendency in Brittain, he simply could not have disregarded any such need.

21.     Testimony of Stacie Nuss.     Plaintiff Stacie Nuss is the aunt, and only relative of Brittain at the time of his passing.  Brittain lived with her and her family since he was five (5) years old, and she is his legal guardian.  (App. 7, pg. 14).  She testified that "he had a lot of stuff going on in his head," and that he had been diagnosed with depression, bi-polar disorder and possibly schizophrenia.  (App. 7, pg. 17, 20, 21, 24, 44-45).    However, she stated that the diagnosis of "borderline schizophrenia" was not noted, only verbal.  (App. B, pg. 24).  Brittain started receiving treatment from the Behavioral Health Center at age 13. (App. B, pg. 31).  According to Ms. Nuss, Brittain was also a "street-drug" user.  (App.7, pg. 18-19, 20).  Brittain voluntarily checked into the House of Benjamin approximately two (2) weeks before his arrest on October 18, 2016.  The House of Benjamin is a "rehab facility to help people better themselves."  (App. 7, pg. 16-17, 73).

22.     Despite Brittain's years of reported mental health issues and street-drug use, and his residency at the House of Benjamin, Plaintiff testified that she *never* observed anything, and *never* heard anything, that made her feel like Brittain had the potential to commit suicide.  (App. 7, pg. 59).  Brittain never threatened to commit suicide, never threatened to harm himself, and never demonstrated suicidal tendencies.  (App. 7, pg. 58-59).  In fact, Plaintiff testified to the opposite – that Brittain was scared of death.  (App. 7, pg. 60).

## VI.
## APPLICATION OF LAW TO FACTS

1.     In order to survive summary judgment, Plaintiff must present some evidence to demonstrate that each of the individual named Defendant Officers violated Brittain's constitutional rights.  To make such a showing, Plaintiff must establish that each of the Defendants knew that

Brittain had a serious medical need *and* that each individual Defendant acted with deliberate indifference to that serious medical need. If Plaintiff is able to establish that the Defendant violated Brittain's constitutional rights, then in order to proceed with her claim, she must also overcome each Defendant Officer's claim of qualified immunity by showing that each particular Officer's actions were objectively unreasonable in light of the circumstances. As discussed herein, each of the individual Defendants Wennerstrom, Young, Gomez, and Bee-Taylor are entitled to summary judgment because:

(1)     Plaintiff has not (and cannot) establish that the Defendants knew that Brittain had a serious medical need,

(2)     Plaintiff has not (and cannot) establish that Defendants acted with deliberate indifference to that serious medical need, and

(3)     Plaintiff has not (and cannot) establish that Defendants' actions were objectively unreasonable in light of the circumstances.

2.     <u>Defendant Gomez</u>.     The record establishes that Officer Gomez was the officer who made the first contact with Brittain on October 18, 2016. (App. 1). He was advised that Brittain was wanted on an active warrant out of the Henderson County Sheriff's Office. Brittain was arrested behind an apartment complex. (App. 1). He was joined by Sergeant Young at the site, who also spoke with Brittain. He was placed under arrest, and Gomez transported him to the City of Seven Points for book-in in the back of his police vehicle. Gomez held the rank of Sergeant, and had worked previously as a jailer at the Henderson County Sheriff's Office. (App. 1). During the transport, Brittain showed him no signs of unusual behavior, medical problems, or drug intoxication.

3.     Once he arrived at the Seven Points Jail, Gomez took care of the book-in process. He asked Brittain a wide range of questions regarding possible medical problems, and even asked if he had

any suicidal tendencies.  Brittain responded no to all questions and said nothing about medical problems or mental illness.  Gomez does not recall any statement by Brittain that he was having "head problems" or that he was "messed up in the head."  There was no mention by Brittain of having schizophrenia or having been in the House of Benjamin.  (App. 1).   During the entire transport and book-in process, Gomez observed that Brittain was calm.  Brittain never showed any hostility, or out-of-control conduct.  (App. 1).  Gomez finished the book-in process, and placed Brittain in the holding cell.  He had observed nothing that caused him to believe that Brittain faced a substantial risk of serious bodily harm, or had a tendency to harm himself.  Gomez concluded his shift and went off duty at approximately 18:00 after he concluded the book-in of Brittain.  He had no further contact with Brittain.  There is nothing in this record to establish that Sergeant Gomez observed any indication of a serious medical need by Brittain, and thus he simply could not have disregarded such a need.   In fact, Gomez specifically asked Brittain  about several medical needs, and these were denied.  Likewise, Gomez observed nothing to make him believe that Brittain was at a substantial risk of committing suicide, and thus could not have disregarded such a need.  The analysis is very simple because at no time was Gomez presented with facts that made him think or believe that Brittain was suicidal, and Gomez thus, never drew that inference. (App. 1).   Even if Brittain had made a comment about being "messed up in the head," as alleged by Plaintiff, it would not change the analysis.  It is obvious that regardless of what comments were made, Sergeant Gomez did not know what they meant.  Further, from the statements alone, an inference cannot be drawn of a serious medical need.  Indeed, "[p]olice are not psychiatrists, and even psychiatrists cannot necessarily distinguish between a mental illness or handicap on one hand and drug-induced or simply obnoxious behavior on the other" in a short span of time.  *Barlow v. Owens,* 400 F. Supp. 2d 980, 984 (S.D. Tex. 2005).  Additionally, to be liable for a constitutional violation, Sergeant Gomez needed to not only be aware of facts that created an inference of a

serious medical need, he also *must have drawn the inference. Farmer,* 511 U.S. at 837. At no time was Gomez presented with facts that made him think or believe that Brittain was suicidal, and Gomez never drew that inference. (App. 1).

4.      Defendant Sergeant Young.     The record establishes that Sergeant Young had contact with Brittain at the site of the arrest, and on other occasions while Brittain was in custody at the City of Seven Points during the evening of October 18, 2016. He personally observed nothing that caused him to think that Brittain was suffering from an immediate medical problem, or was suicidal. (App. 2). After the arrest was made, they returned to the Seven Points Police Department where Officer Gomez was in charge of the book-in process.

5.      Later that evening when Sergeant Young was on patrol and was called back to the station, he spoke at length with Brittain because Brittain wanted to speak with the Sergeant. Although Brittain told him that he was frustrated, had been to the House of Benjamin recently, and was having some conflict with his girlfriend, he did not say anything about medical problems, medical needs, or any issues with suicidal thoughts. (App. 2). Sergeant Young further allowed Brittain to make a phone call to his counselor Rachel at the House of Benjamin upon request, and allowed him to complete his discussion. Sergeant Young also talked with Rachel when she asked to speak with him. She advised Sergeant Young that Brittain had a problem with drug use, but that she had also observed some signs of schizophrenia and other mental diseases while he was at the House of Benjamin. She did not go so far as to advise Sergeant Young that Brittain had been medically diagnosed with schizophrenia. Sergeant Young advised Rachel that Brittain should be picked up the next morning for transport to the Henderson County Detention Center where he could receive care from the regular medical staff. She did not indicate to Sergeant Young that Brittain needed more urgent care than what he had proposed. After concluding the conversation with Rachel, Sergeant Young personally put Brittain back in the jail cell. As he was doing so he carried on a

conversation with Brittain.  Brittain assured Sgt. Young that he was "fine" after talking with his counselor, and further responded that he had "no problems" when Sergeant Young asked him additional questions.  Sergeant Young further questioned him as to whether he had any intentions of hurting himself, to which Brittain responded "he did not."  At no point did Sergeant Young observe anything that caused him to believe that Brittain was at risk for committing suicide, or otherwise was at risk to suffer a substantial medical harm.  (App. 2).  Certainly, at that point it cannot be seriously argued that Sergeant Young had become aware of facts from which an inference could be drawn that a substantial risk of serious harm existed for Brittain, and actually drawn that inference.  Further, there is no evidence to demonstrate that Sergeant Young was "deliberately indifferent to [the known] risk by failing to take reasonable measures to abate it." *Converse v. City of Kemah,* 17 – 41234, 2020 U.S. App. LEXIS 18607, at *2 (5th Cir. June 12, 2020).  There simply is no evidence that Sergeant Young was deliberately indifferent to a serious medical need of Brittain's.  In fact, the Plaintiff has not established through evidence in the record that Sergeant Young acted with deliberate indifference to any serious medical need of Brittain's. When Sergeant Young next received information concerning Brittain, he was contacted by Ms. Bee-Taylor at approximately 01:54 on the morning of October 19, 2016.  When advised that Brittain was threatening to bang his head on the cell, and had hung his blanket up on the bars to block the view, Sergeant Young's actions were anything but indifferent once again.  He was advised by Ms. Bee-Taylor that Officer Foster from the Tool Police Department was on the way to assist.  Sergeant Young instructed her to have Brittain removed from the cell and handcuffed to the bench in the book-in area until he could arrange for immediate transfer to the Henderson County Jail by way of Henderson County Sheriff's deputy.  He immediately followed that call with a call to Henderson County to request an immediate transfer.  However, Officer Foster arrived within minutes of his call to Ms. Bee-Taylor to find that Brittain had hung himself.  Sergeant

Young immediately contacted Chief Wennerstrom and advised him of the situation.  Sergeant Young then immediately headed for the medical facility where Brittain was being transported.  As the United States Supreme Court has stated "deliberate indifference is an extremely high measure to meet." *Domino v. Texas Dep't of Criminal Justice,* 239 F. 3d 752, 2001 U.S. App. LEXIS 1723, (2001).   Deliberate indifference cannot be inferred merely from a negligent, or even a grossly negligent response to a substantial risk of serious harm.  Cases interpreting deliberate indifference have consistently recognized that "deliberate indifference cannot be inferred merely from a negligent, or even a grossly negligent response to a substantial risk of harm." *Thompson v. Upshur Cty., Tex.,* 245 F. 3d 447, 457 (5th Cir. 2001) (citing *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).  With regard to Sergeant Young, there is no evidence in the record to establish that his actions with regard to Brittain rose to the level of deliberate indifference.  At most, Sergeant Young's decisions with regard to Brittain following his conversation with counselor Rachel might be argued as negligent, but his conduct certainly didn't rise to the level of deliberate indifference.

6.      Even in the unlikely event that Plaintiff was able to establish that Brittain had a serious medical need of which Sergeant Young was subjectively aware *and* that Young acted with deliberate indifference to that serious medical need, Young is still entitled to summary judgment on the basis of qualified immunity *unless* Plaintiff can show that all reasonable officers in the same situation as Sergeant Young would have known that Sergeant Young's acts violated the United States Constitution.

7.      In the case of *Thompson v. Upshur Cty.,* the Fifth Circuit found that "clearly established law prevents a jailer from responding to a serious medical need with deliberate indifference." Id at 460 But, it was not clearly established that a jailer "must force a conscious, incompetent, but clearly refusing inmate to undergo medical treatment or seek a surrogate decision-maker for the same."  *Id.*  Accordingly, there is no basis for finding that Sergeant Young's conduct was not

objectively reasonable under the circumstances.  In the *Upshur Cty.*decision, the Fifth Circuit found that the defendant sheriff was entitled to qualified immunity.  In doing so, the Court stated that "[e]xamples of behavior that does (and does not) constitute deliberate indifference are relevant in assessing the scope of clearly established law and therefore, are relevant in determining whether the defendant's actions were objectively reasonable."  In this case, Plaintiff cannot demonstrate that all reasonable police officers would recognize the unconstitutionality of Sergeant Young's personal acts or omissions.  In fact, no such evidence is in the record.

8.     <u>Defendant Bee-Taylor</u>.  Dispatcher Bee-Taylor  was extremely attentive to Plaintiff as is evidenced by her numerous entries on the inmate check sheet.  (App. 4).  She talked with him on a number of occasions, and made his concerns known to both Sergeant Young and Officer Greiner. Following his telephone call with his counselor, the evidence shows that Bee-Taylor had very little problem with disruptive behavior from Brittain.  At no point did he threaten to hurt himself or commit any violence.  (App. 5).  At approximately 01:43 on the morning of 10-19-16 when he was threatening to "bash his head in against the cell door and get blood everywhere" she responded by speaking with him and making an attempt to calm him down.  (App. 5).  She continued her actions by then calling the Tool Police Department and requesting immediate assistance.  Without delay, she then contacted Sergeant Young to advise him of the situation and to seek his additional help. It is important to note that at the time that Ms. Bee-Taylor made these phone calls, Brittain had not yet injured himself and certainly had not threatened to commit suicide.  In fact, he never made any threat to commit suicide.  As discussed earlier in this Brief, the Fifth Circuit has "repeatedly held that pretrial detainees have a Fourteenth Amendment right to be protected from a known risk of suicide." *Hare,* 74 3d at 643.  "[I]t is well-settled law that jail officials violate this right if 'they [(1)] gained actual knowledge of the substantial risk of suicide *and* [(2)] responded with deliberate indifference.'"  *Hare,* 74 3d at 650 (emphasis added).  Ms. Bee-Taylor had no reason to believe

that Brittain actually suffered from a serious medical need during their encounter, however, at the mere threat of taking action which might place him at a risk of harm she immediately went into action. There is no evidence to establish that Ms. Bee-Taylor knew that Brittain had a serious medical need or that she acted with deliberate indifference to that serious medical need. She certainly did not draw the inference that Brittain was at risk for suicide. (App. 5).

In *Posey v. Southwestern Bell Tel. Lp,* 430 F. Supp. 2d 616 (N.D. Tex. 2006), Posey was arrested for assault/family violence. *Id.* at 618. During booking, Posey was questioned regarding his mental health, but Posey did not alert the jail officials to any mental health issues. *Id.* Posey was assessed by a nurse and placed in a cell. The nurse noted that Posey should be observed and that he should see a psychiatrist for his anger problems. *Id.* From the cell, Posey called his mother. After his mother complained about the call, Posey was moved to another cell with a non-working phone. Posey used the cord of the nonfunctional telephone to hang himself. When he was discovered, a jail nurse performed CPR on Posey. Posey was transported to a hospital, where he was pronounced dead. *Id.* Posey's parents brought suit under 42 U.S.C. § 1983, claiming that the county violated Posey's constitutional rights. Posey's parents claimed that Posey was "irrational, under the influence of drugs and hostile, and this was evidence that he was a suicidal risk." In granting the County's Motion for Summary Judgment, the District Court noted that Posey's parents had "not demonstrated that the County employees had subjective knowledge of a substantial risk of serious harm to Posey regarding his medical needs or safety." *Id.* at 622-23. The Court noted that "based on the medical and psychological evaluation of Posey by jail personnel, there was insufficient evidence that he would commit suicide." *Id.* As in Posey, there was insufficient evidence that Brittain would commit suicide. Like Posey, Brittain did not alert Ms. Bee-Taylor or any of the other police department personnel of any mental health issues or indicate any suicidal tendencies. Each time that anyone asked how he was doing, Brittain either

said, "fine", or had a specific request.  However, he never threatened to commit suicide.  Ms. Bee-Taylor certainly never drew that inference.  If Plaintiff, the person who raised Brittain and was closest to Brittain, never drew an inference that Brittain had suicidal tendencies, how could Ms. Bee-Taylor draw such an inference based on her limited interaction with Brittain – particularly when, during each such interaction, Brittain wanted "to talk to a sergeant" or simply wanted a cigarette.  (App. 5).  There is simply no evidence in the record to establish that Ms. Bee-Taylor acted with deliberate indifference to Brittain.

9.      Defendant Chief Wennerstrom.    Clearly, Chief Raymond Wennerstrom had no contact with Brittain at any point during this arrest.  Chief Wennerstrom was not aware that Brittain had been arrested, and was not called upon to make any decisions regarding the incarceration of Brittain until he received a call from Sgt. Young.  At that time, he was made aware by way of telephone call from Sergeant Young advising of the plan to address Brittain's threats to "bang his head against the cell wall," and arrange for immediate transfer of custody to the Henderson County Detention Center.  At that point, Chief Wennerstrom had very little input into the matter, and had no personal knowledge of Brittain's actual physical or mental issues.  He agreed with Young's plan, and allowed him to proceed. There is certainly no evidence in the record to establish that he had knowledge of a serious medical need of Brittain's, or that he drew an inference from any of Brittain's conduct that he was at risk for suicide.  Under the facts established in this case, there is no possibility that within a few moments of finding out that Brittain was in custody, he had drawn the inference that Brittain was at a substantial risk of harm, and demonstrated deliberate indifference to that risk.  The Plaintiff has not (and cannot) establish that Wennerstrom knew that Brittain had a serious medical need, or that he had suicidal tendencies.  Within moments of learning that Brittain was in custody, Wennerstrom received a second call advising him that Brittain had

attempted suicide and was being transported to a local medical facility by EMS.  There is no evidence in the record establishing deliberate indifference on the part of Chief Wennerstrom.

10.     Accordingly, a reasonable officer in the shoes of each Defendant Officer herein could have believed that each Officer's actions were lawful and consistent with Brittain's rights to receive attention for serious medical needs as a pretrial detainee.  Further, the claims against these Defendant Officers are barred by qualified immunity.

11.     Further, here, Plaintiff cannot demonstrate that all reasonable police officers would recognize the unconstitutionality of Wennerstrom's personal acts or omissions. Wennerstrom had no knowledge of the facts regarding Brittain as they developed, and took no action in dealing with him. His first information was received immediately before he attempted suicide. Plaintiff has not and cannot establish that Wennerstrom's actions were objectively unreasonable in light of the circumstances.

12.     For the foregoing reasons, the Individual Officer Defendants move for Summary Judgment as to Plaintiff's claims pursuant to F.R.C.P. 56 as there is no genuine issue of material fact on the record as to each Defendant's qualified immunity from such claims.

## VII.

## REQUIREMENTS OF A  MUNICIPAL LIABILITY CLAIM

1.     To establish municipal liability for an alleged constitutional deprivation, Plaintiff must show that the purported deprivation was the direct result (due to the moving force) of a policy, practice or custom of the municipality involving deliberate indifference of a policymaking official.  *Bryan County v. Brown,* 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  Recovery from a City may occur "only when it can be fairly said that the City *itself* is the wrongdoer." *Gonzalez v. Ysletta Independent School District,* 996 F. 2d 745, 755 (5th Cir. 1993) (emphasis added).  To establish that the City is the wrongdoer, Plaintiff must show that "action pursuant to official municipal policy

of some nature caused a constitutional tort." *Jett v. Dallas Independent School District,* 491 U.S. 701, 729, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (quoting *Monell,* 436 U.S. at 691). Municipal liability under §1983 cannot be predicated on the doctrine of agency or *respondeat superior. Monell v. New York Dep't of Social Services,* 436 U.S. 658, 690-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Isolated actions by municipal employees do not create liability for the municipality unless the single act or decision is conducted by an official with final policymaking authority. *McKee v. City of Rockwall,* 877 F. 2d 409, 415-16 (5th Cir. 1989); *Woodard v. Andrus,* 419 F. 3d 348, 352 (5th Cir. 2005), cf. *Mosser v. Haney,* 2005 W.L. 1421440, *3 (N.D. TApp. June 17, 2005) (J. Boyle).

> It is well established that a city is not liable under [§] 1983 on the theory of *respondeat superior.* A municipality is liable only for acts directly attributable to it through some official action or imprimatur. To establish municipal liability under [§] 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy. A plaintiff must identify: (1) an official policy (or custom) of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. *Valle v. City of Houston,* 613 F. 3d 536, 541-42 (5th Cir. 2010) (internal citations and quotation marks omitted).

Additionally, Plaintiff must plead specific facts to establish the deliberate indifference of the policymaker involved. See *Brown v. Bryan County,* infra. Thus, Plaintiff has the burden to plead *specific facts,* rather than *conclusory allegations,* which would establish <u>more</u> than a mere possibility that the alleged deprivation decedent's legal rights were due to a policy, practice or custom of the City involving the deliberate indifference of a policymaking official.

2.      Plaintiff must show (1) a municipal policy (2) attributable to the City's final policymaker (3) which caused Plaintiff's decedent to be deprived of a (4) federal constitutional right. *Lopez v. Houston Independent School District,* 817 F. 2d 351, 354 (5th Cir. 1987); *MacDonald v. City of Freeport,* 834 F. Supp. 921, 934 (E.D. TApp. 1993). Plaintiff "must… allege that an official policy or custom of the [city] was a cause in fact of the deprivation of the rights afflicted." *Lafall v. Dallas Ind. Sch. Dist.,* 28 F. 3d 521, 525 (5th Cir. 1994); see also, *Callis v. Sellars,* 931 F. Supp. 504, 505 (S.D. TApp. 1996)

("in order to state a claim against a municipal defendant under § 1983, plaintiff must sufficiently plead the existence of a policy or custom which was the "moving force" behind the deprivation of his constitutional rights.").

The constitutional rights of pretrial detainees and convicted prisoners are derived from different sources.  Whereas the constitutional rights of a convicted state prisoner spring from the Eight Amendment's prohibition on cruel and unusual punishment, the constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment.  *Hare v. City of Corinth, Miss.,* 74 F. 3d 633, 639 (5th Cir. 1996) (*en banc*) (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979)).  These rights include the right to medical care.  *Sanchez v. Young County, TApp.,* 866 F. 3d 274, 279 (5th Cir. 2017, and the right to protection from known suicidal tendencies, *Flores v. County of Hardeman, TApp.,* 124 F. 3d 736, 738 (5th Cir. 1997)).

3.     The issue of training to detect suicidal tendencies was addressed by the Fifth Circuit Court of Appeals in the case of *Burns v. City of Galveston,* 905 F. 2d 100 (5th Cir. 1990).  In that case the court stated that "[a] municipality should be required to provide its police officers with minimal training to detect '*obvious* medical needs of detainees with *known,* demonstrable, and serious mental disorders.'" *Id.* at 104 (emphasis supplied).   Police personnel are not required to "unerringly detect suicidal tendencies," such an exacting standard "requires the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police officer by the due process clause." *Id.*  "Recognizing these practical realities, the *Burns* Court held that detainees have no absolute right to a complete psychological examination." *Id.*  Absent such a right, the failure to train custodial officials in screening procedures to detect *latent* suicidal tendencies does not rise to the level of a constitutional violation. *Id.*  The evidence clearly establishes that there was no indication that Cody Brittain would attempt to take his own life following his arrest on October 18, 2016.  The

Officers' Affidavits establish that Brittain did not exhibit any apparent suicidal behavior on the night of his attempted suicide. Further, there was no evidence prior to his incarceration demonstrating a suicidal tendency prior to that evening. Even the Plaintiff, Stacie Nuss, who was Brittain's primary caretaker testified that she was aware of no suicidal inclination prior to that evening. Brittain had lived with Nuss since he was approximately five years old. She testified that he was not suicidal, and had never threatened to harm her or himself. In her opinion, he was "scared of death." Yet these Defendants are sued for placing Brittain in jail while they all "subjectively knew" that he was severely mentally ill, potentially suicidal, and drug addicted.

4.      Texas Commission on Jail Standards do not establish constitutional rights, and are not actionable under §1983.

The majority of the Plaintiff's allegations as stated in Plaintiff's First Amended Complaint are focused on the alleged failure of the City of Seven Points, a municipal entity, and the officers to follow the protocols mandated by Texas law as administratively adopted by the Texas Commission on Jail Standards. It is well established that violations of state law are not actionable under § 1983.[1] The administrative protocols do not establish constitutional rights to treatment for detainees, nor do they so purport. Additionally, even if the Plaintiff's evidence of noncompliance with the TCJS requirements might support liability against a County, it will not support liability against a municipality, or municipal employees.[2]

---

[1] *San Jacinto Sav. & Loan v. Kacal,* 928 F. 2d 697, 701 n. 4 (5th Cir. 1991) (citing *Jones v. Diamond,* 594 F.2d 997, 1011 (5th Cir. 1979)).

[2]   Plaintiff assumes throughout Plaintiff's First Amended Complaint that the Standards set forth by the Texas Commission on Jail Standards applies to City jails such as the Seven Points holding facility, and further concludes that Defendant City has violated numerous of these Standards, thus causing injury to Cody Brittain. The Texas Commission on Jail Standards are only applicable to County jails – not temporary detention facilities such as City jails. Mores specifically, the Texas Commission on Jail Standards only has authority for setting Standards applicable to County jails.  (see TApp. Gov't Code § 511.009(a)(1); Texas Administrative Code Title 37 Cp. 251 Rule 251.1). See also 37 T.A.C. § 275.1 – which sets a Rule applicable only to County jails.  The Seven Points jail simply is not subject to these Rules.

Brief in Support of Defendants' Motion for Summary Judgment. No. 3:18cv02192X P a g e | 30

The Plaintiff alleges a number of violations against the City for failing to provide certain protections required by the Texas Commission on Jail Standards, and has alleged repeatedly that these Jail Standards are applicable to municipal holding cells such as the holding facility operated by the City of Seven Points.  However, nowhere in Plaintiff's operative pleadings does Plaintiff offer evidence establishing that the Jail Standards are applicable to municipal holding facilities such as Seven Points.  In fact, in Plaintiff's First Amended Complaint Plaintiff concedes that they are not binding on municipal jails.  Perhaps more importantly, Plaintiff has failed to produce any evidence establishing that the Jail Standards set the constitutional minimum requirements for a municipality, or otherwise articulate the constitutional standard for Texas municipalities, or Texas municipal police employees.  In fact, Texas Commission on Jail Standards protocols "do not establish constitutional rights to treatment for detainees, nor do they so purport."  *Whitt v. Stephens Cty,* 236 F. App'x 900, 903 (5th Cir. 2007).   In fact, while City policy requires that its police department employees seek prompt emergency medical care for detainees who show an obvious suicidal tendency (App. 8), Plaintiff has tendered no evidence establishing that the City is required to conduct a suicide screening for all arrestees.  This is because no such requirement exists.  As a result, a failure to train officers in screening procedures to detect suicidal tendencies does not rise to the level of a constitutional deprivation.  *Burns v. Galveston,* 903 F. 2d 100, 104 (5th Cir. 1990). See also *Whitt v. Stephens Cty,* 529 F. 3d 278, 284 (5th Cir. 2008).  "[T]he failure to train custodial officials in screening procedures to detect latent suicidal tendencies does not rise to the level of a constitutional violation."  *Evans v. Marlin,* 986 F. 2d 104, 108, (5th Cir. 1993).  Each of the officers employed by the City, including dispatcher Chelsea Bee-Taylor, were trained and licensed by TCOLE.  The City was not put on notice of any inadequate training because the training of its officers was not inadequate.  Although Plaintiff alleges that the City had a custom or policy of failing "to train, screen, properly monitor, inadequately staff, provide adequate medical care, and

Brief in Support of Defendants' Motion for Summary Judgment. No. 3:18cv02192X  P a g e  | **31**

responding to 'suicide attempts,'" to supervise and provide for the safety of the arrestees, they have no evidence to support, or basis to establish liability for, those allegations.

5.      The Texas Commission on Jail Standards, which include requirements such as a health and suicide screening and medical and mental health services, do not apply to a municipal jail.  Thus, these Standards do not establish minimum requirements for operation of the City's holding facility, and cannot be used as a basis for establishing deliberate indifference on the part of the City.  To meet the requirements argued by Plaintiff the City would be required to hire and maintain on staff an experienced medical professional with psychiatric training, capable of detecting mental disorders and suicidal tendencies.   Indeed, no evidence is offered to establish this as a constitutional requirement for municipalities, or more specifically, for the Defendant City in this case.

6.      A plaintiff seeking to establish municipal liability on the theory that a facial and lawful municipal action has led an employee to violate a plaintiff's rights <u>must</u> demonstrate that the municipal action was taken with "deliberate indifference" as to its <u>known</u> or <u>obvious</u> consequences… a showing of simple or even heightened negligence will not suffice.  *Bryan County v. Brown,* 520 U.S. at 407 (emphasis added) (citation omitted).  The standard requiring deliberate indifference for municipal liability "is a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious consequence* of his actions." *Id.* at 410. (emphasis added).  The plaintiff must identify the final policymaker and demonstrate that an " official policy or custom" of the final policymaker was causally the "moving force" of the constitutional deprivation in question." *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F. 3d 521, 532-33 (5th Cir. 19996); *Spiller v. City of Texas City,* 130 F. 3d 162 (5th Cir. 1997).  "[T]he complainant must identify the policy, connect the policy to the City itself and show that the particular injury was incurred because of the execution of that policy." *Bennett v. City of Slidell,* 728 F. 2d 762, 767 (5th Cir. 1984).  However, to hold the City

Brief in Support of Defendants' Motion for Summary Judgment. No. 3:18cv02192X P a g e | **32**

liable, the plaintiff must also establish the state-of-mind of the municipality's legislative body or an authorized decision-maker to prove the underlying violation. *Brown,* 520 U.S. at 405, 117 S. Ct. at 1389. The necessary state-of-mind for the liability against the City is deliberate indifference.

In order to establish deliberate indifference to Brittain's alleged medical needs or risk of suicide, the Plaintiff must establish that "the official knows of and disregards an excessive risk to Brittain's health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994). "[D]eliberate indifference to serious medical needs … requires a showing 'that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Irugas v. Bruce,* 623 F. App'x 240, 240-41 (5th Cir. 2015).

7.     When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission. *Hare,* 74 F. 3d at 644. Cases of the former are attacks on "general conditions, practices, rules, or restrictions of pretrial confinement." *Id.* In cases of the latter, "the complained-of harm is a particular act or omission of one or more officials," and "an actor usually is interposed between the detainee and the municipality." *Scott v. Moore,* 114 F. 3d 51, 53 (5th Cir. 1997) (*en banc*). The Supreme Court has declared that in a case presenting a conditions theory, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell,* 441 U.S. at 535. The Fifth Circuit generally applies the rule that theories in which a particular actor is "interposed" between the injured party and the municipal defendant are properly treated as episodic-act cases. *Garza v. City of Donna,* 922 F. 3d 626, 635 (5th Cir. 2019). In the present case, Plaintiff has brought suit against numerous individual

City of Seven Points employees, and Plaintiff's claims are focused upon the acts and omissions of these City employees.

To establish municipal liability in an episodic-act case,  a plaintiff must show "(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference." *Brumfield v. Hollands,* 551 F. 3d 322, 331 (5th Cir. 2008) (quoting *Olabisiomotosho v. City of Houston,* 185 F. 3d 521, 528-29 (5th Cir. 1999)).

8.    Plaintiff's §1983 under *Monell* fails because there is no evidence of a deliberate policy which caused a constitutional deprivation.

Even if the Court were to find a constitutional violation by any of the Individual Defendants, there can be no municipal liability because Plaintiff has failed to establish the requisite elements. In *Monell,* the Supreme Court made it clear that municipalities cannot be sued under §1983 on a theory of vicarious liability for the actions of its employees; rather, an official policy must have caused the employee to violate another's constitutional rights.  *Monell,* 436 U.S. at 691. Rigorous standards of culpability and causation standards must be applied where municipal liability is alleged to ensure that the municipality is not held liable solely for its employees' actions. *Bd. Of the County Comm'ns of Bryan County v. Brown,* 520 U.S. 397, 407, 117 S. Ct. 1382 (1997). If a city's deliberate policy or act directly violated a person's constitutional rights, the city will be liable under §1983.  See *Leffall v. Dallas Independent School Dist*., 28 F.3d 521, 525 (5th Cir. 1994).  The Fifth Circuit set forth the following framework for determining a governmental entity's liability under §1983:

"A municipality is liable under §1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy.  Official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Actions of officers or employees of a municipality do not render the municipality liable under §1983 unless they execute official policy as above defined."

*Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curium), *cert. denied*, 472 U.S. 1016 (1985); see also *Bennett*, 728 F.2d at 769; *Johnson v. Deep E. Tx. Reg'l Narcotics Task Force, 379 F.3d 293 (5th Cir. 2004)*, 379 F.3d at 309; and *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996).

Thus, in order to hold Defendant City liable under §1983, Plaintiff must show a constitutional deprivation that occurred due to an official policy as defined above.  *Monell*, 436 U.S. at 690. Plaintiff has offered no evidence to support this element of his claim.

Plaintiff must also demonstrate actual or constructive knowledge of the official policy by the policy making official for Defendant City.  *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002) (holding no constructive knowledge of policymakers where plaintiffs provided no evidence that the incidents were the subject of prolonged public discussions or of a high degree of publicity); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (stating "[s]ufficiently numerous prior incidents of police misconduct, for example, may tend to prove a custom and accession to that custom by the municipality's policymakers. Isolated instances, on the other hand, are inadequate to prove knowledge and acquiescence by policymakers.").

Additionally, the culpability element of a §1983 action, which may overlap with proof of a policy, requires evidence that the governmental action "was taken with 'deliberate indifference' as to its known or obvious consequences.  A showing of simple or even heightened negligence will not suffice."  *Bryan County,* 520 U.S. at 407 (applying *Monell* and its progeny to county).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."   *Id.* at 410.   A plaintiff must demonstrate that a governmental decision reflected deliberate indifference to the risk that a violation of a particular constitutional or statutory right would follow the decision.  *Id.* at 411.

Accordingly, Plaintiff must show that an alleged policy or custom was adopted or maintained by Defendant City with deliberate indifference to the known or obvious fact that such constitutional violations, as alleged by Plaintiff, would result. *Johnson*, 379 F.3d at 309.  This "generally requires that a plaintiff demonstrate at least a pattern of similar violations."   *Id.* Allegations of an isolated incident are not sufficient to show the existence of a custom or policy. *Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir. 1992).  **A plaintiff must identify the policy, connect the policy to the municipality itself and show that his injury was incurred because of the application of the specific policy.**  See *Bennett,* 728 F.2d at 767.  "Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy." *Fraire,* 957 F.2d at 1278.  The Supreme Court, in denying liability on a single claim of a constitutional violation (excessive force), explained as follows:

> "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.  Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved.  But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation."  *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-824 (1985) (citations omitted).

In short, the existence of a constitutionally deficient policy cannot be inferred from a single wrongful act.  See *O'Quinn v. Manuel,* 773 F. 2d 605, 610 (5th Cir. 1985) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S. Ct. 2427 (1985)).   The policy or custom causing the alleged injury must be a "deliberate or conscious choice" by individuals with policymaking authority.

*Richardson v. Oldham,* 12 F.3d 1373, 1381-82 (5th Cir. 1994).  In the present case, the Plaintiff has offered absolutely no evidence of a pattern of similar incidents (inmate suicides) in the Seven Points Municipal Jail.  The reason for this absence of evidence is very easy to explain, there have been no previous incidents of inmate suicide at Seven Points.  Police Chief Raymond Wennerstrom testified that he was unaware of any prior suicides at the Seven Points jail.  (App. 6).  Seven Points Police Sergeant Brandon Young testified that there have been no prior suicides during his tenure. (App. 2).  In addition, Officer Francisco Gomez confirmed that, to his knowledge, there had been no prior inmate suicides at the Seven Points facility.  (App. 1).  As a result, there is a complete lack of evidence to establish that the attempted suicide of Cody Brittain was the direct result of a policy or custom maintained by Defendant City with deliberate indifference to the known or obvious fact that injury to inmates, including attempted suicides, would result.

Additionally, a municipality's liability inures only when the execution of the city's policy or custom causes the injury.  *Monell*, 436 U.S. at 694.  A §1983 plaintiff must show that, through its deliberate conduct, the governmental entity was the **"moving force"** behind the injury alleged. *Brown*, 520 U.S. at 404 & 408; see also *City of Canton v. Harris*, 489 U.S. 378, 388-89, 09 S.Ct. 1197 (1989) ("must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of); and *Johnson*, 379 F.3d at 310.  That is, a plaintiff must show that the deliberate governmental action was taken with the requisite degree of culpability and must demonstrate the action directly caused the deprivation of federal rights.  *Brown*, 520 U.S. at 404 & 415. Plaintiff has produced no evidence in the record which shows this official policy which was the "moving force" and caused his alleged constitutional deprivation.

E.     The evidence demonstrates that the City of Seven Points does not have a policy  or custom that promotes inattention to the medical needs of inmates.

As discussed above, under the *Monell* line of cases, Plaintiff must show a constitutional deprivation that occurred due to an official policy in order to hold Defendant City liable under

§1983.  *Monell,* 436 U.S. at 690.  Here, the summary judgment evidence supports none of these elements.  In fact, the only evidence concerning "policy" shows that the City of Seven Points has no policies or customs which approve, enable, or allow unlawful arrests or other constitutional violations (See App. 8).

10.     The Plaintiff has alleged a §1983 constitutional claim against Defendant City for the violation of Brittain's Fourteenth Amendment rights which is based upon the alleged inattention to his medical needs, which resulted in his attempted suicide.  In the context of medical care, officials violate the Fourteenth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs.  *Hare v. City of Corinth, Miss.,* 74 F. 3d 633, 643 (5th Cir. 1996) (*en banc*).  The standard of deliberate indifference is a stringent one.  With regard to Brittain, the Plaintiff must establish that the Defendants "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Domino v. Texas Dep't of Criminal Justice,* 239 F. 3d 752, 756 (5th Cir. 2001) (internal quotation marks and citation omitted).  In order to present a cognizable claim under this theory and support an inference of deliberate indifference, the Plaintiff must establish facts which demonstrate that an official (here, each individual Defendant, "knows of and disregards an excessive risk to inmate held for safety;"  the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.  *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).  Mere negligence is insufficient to meet the standard.  *Hare v. City of Corinth, Miss.,* supra at 645.  The evidence in this record clearly establishes that none of the Defendant Officers or other Defendants were aware of, or inferred, that Brittain suffered from any condition which posed a substantial risk of serious harm.  More specifically, none of the Defendants drew the inference that Brittain exhibited signs that he presented a substantial risk to injure himself when Defendant Bee heard

him threaten to bash his head against the bars. (Ap. 5) At that point, her conduct was anything but deliberately indifferent.  Rather than showing complete inattention to his threat, or intentionally choosing to ignore him, she immediately sought assistance from the patrol officer on duty.  (App. 5).   When it was decided that the most available help was located in nearby Tool, Texas, she placed a phone call to the Tool dispatch to expedite help.  Officer Matthew Foster of the Tool Police Department arrived at 01:58, less than 8 minutes after Defendant Bee had placed the phone call.  They were aware that Brittain had threatened to "bash his head against the bars and get blood everywhere," and the plan was to move him from the cell to the book-in area where he would be handcuffed to the bench until custody could be transferred to a Henderson County Sheriff's Deputy.  (App. 5).  Brittain had never threatened to commit suicide, or otherwise kill himself. There is no evidence that he made any such remark to any of the Defendants at any time during his detention.  There is no evidence that any of these Defendants was aware of any serious risk of harm to Cody Brittain.

11.     In the context of a suit based on the suicide of a pretrial detainee, the Fifth Circuit holds that the Defendant's potential constitutional liability is governed by the standard of subjective deliberate indifference enunciated by the Supreme Court in *Farmer v. Brennan,* supra.  See *Hare v. City of Corinth* at 324.   A court applying the subjective deliberate indifference standard recognized that suicide is by definition the act of killing oneself, and ultimately involves an individual's own decision.  The same court stated that it was certain that continuous supervision of a prisoner is not required or even practically possible.  *Gray v. Tunica County,* 279 F. supp 2d 789, 794 (N. D. Miss. 2003).   A plaintiff must show that the suicide victim (in this case the attempted suicide victim);

> "so clearly indicated an intent to harm himself that the [officials] caring for him **could have only concluded** that he posed a serious risk of harm to himself." (emphasis supplied).  *Sibley v. Lemaire,* 184 F. 3d 481, 489 (5th Cir. 1999).

In the *Sibley* case, the prisoner engaged in bizarre behavior, which included chanting to himself, trying to read a Bible upside down, refusing to take a shower because he thought a devil would pull him down the drain, and then violently kicking his cell door to the point that the jail officials monitoring him found it necessary to shackle him. Before the prisoner engaged in this behavior, the jail official had the prisoner examined by a doctor and the doctor recommended that he be transported to a mental health facility. Ultimately, the prisoner harmed himself by plucking out his own eye. The court held that even though there may have been negligence on the part of the jail officials monitoring the prisoner, there was no subjective deliberate indifference when they failed to prevent him from plucking out his eye. 184 F. 3d at 489. It is also important to note that the prisoner's behavior in the *Sibley* case occurred over a several days period of time, while in the present case, Brittain was held in the Seven Points jail for no more than eight (8) hours at most. (App. 2, App. 5).

In the present case, the Plaintiff has alleged that Brittain suffered from "schizophrenia and other mental illnesses." (Complaint). However, the Plaintiff has produced no evidence of any type to establish that Brittain had actually been diagnosed by a qualified medical professional with any form of mental illness, specifically schizophrenia. Moreover, there is no evidence showing that any of the Defendants who had personal contact with Brittain had actual subjective knowledge that Brittain was at risk of committing suicide. While the Plaintiff has alleged repeatedly that the Defendant Officers should have recognized the need for immediate medical treatment (Complaint), the Plaintiff has produced no evidence which establishes that any of the individual Defendants who dealt with Brittain actually were aware of facts from which the inference could be drawn that Brittain was at risk of committing suicide, and actually drew that inference. Accordingly, the Plaintiff's claim for a Fourteenth Amendment constitutional violation for medical inattention fails. There simply is no showing of a violation of the Constitution.

12.     The evidence does not support Plaintiff's claims that the City of Seven Points violated Brittain's statutory rights under the ADA and Rehabilitation Act.

The Plaintiff has also alleged a claim against the City of Seven Points for violation of Brittain's rights under the ADA and Rehabilitation Act by failing and refusing to provide him with reasonable accommodations for his mental disabilities while in custody. (Complaint ¶ 137). The Plaintiff then goes in to delineate several different aspects of the City of Seven Points jail facility that they claim would have constituted reasonable modifications of the facilities, services, and programs which would have been better designed to "reasonably accommodate Brittain's mental disabilities." (Complaint ¶ 138). However, whereas the Americans with Disabilities Act is designed to address the needs of individual disabled Americans who are receiving services provided by governmental entities who receive any form of federal assistance or funding, the Plaintiff's allegations are not stated to address specific accommodations for Brittain of which the Defendants were aware. The Plaintiff's allegations include such matters as the contention that the Defendant City "failed and refused to reasonably modify its facilities, services, and programs to reasonably accommodate Brittain's mental disabilities, including not screening him for suicide risk, not monitoring him in jail, not confiscating his jail-issued clothing and blanket, not having him evaluated by a mental health professional, not taking him to a facility such as the nearby Henderson County jail that could accommodate him, training jailers on suicide prevention, not adequately staffing the jail, or otherwise accommodating his disability to save his life." (Complaint ¶ 138). These "accommodations" described by Plaintiff would have necessarily have needed to be completed by the Defendant City well in advance of Cody Brittain's arrest, and are more accurately described as a global remodeling of the City's physical jail facility, policies, and staffing than as specific accommodations to a known disability of Cody Brittain. Not only has the Plaintiff failed to properly plead a case for discrimination under the ADA and Rehabilitation Act, but the Plaintiff has also failed to produce any evidence which would establish such a cause of

action.  In short, the Plaintiff "has no evidence of intentional discrimination due to Brittain's known disability."

The nondiscrimination principle that was ultimately that was ultimately enacted as §504 of the Rehabilitation Act was originally proposed in 1972 as an Amendment to Title VI of the Civil Rights Act of 1964.  *Alexander v. Choate,* 469 U.S. 287, 295 n. 13 (1985).  The statutory language enacted one year later almost echoes Title VI's prohibition on racial discrimination.

Building on the Rehabilitation Act's protections, Congress passed the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C. §12101(b)(1).  In essence, Title II of the ADA extends §504 of the Rehabilitation Act such that it applies to all public entities.  The ADA defines public entities to include local governments and their instrumentalities. 42 U.S.C. §12131(1)(A)-(B).  The close relationship between §504 of the Rehabilitation Act and Title II of the ADA means that precedents interpreting either law generally apply to both.  *Delano-Pyle v. Victoria County,* 302 F. 3d 567, 574 (5th Cir. 2002).

To establish a *prima-facie* case of discrimination under the ADA a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.  *Melton v. Dall. Area Rapid Transit,* 391 F. 3d 669, 671-72 (5th Cir. 2004).  In addition to prohibiting discrimination, the ADA and the Rehabilitation Act – unlike Title VI – "impose upon public entities and affirmative obligation to make reasonable accommodations for disabled individuals."  *Bennett – Nelson v. La. Bd of Regents,* 431 F. 3d 448, 454 (5th Cir. 2005) see *Tennessee v. Lane,* 541 U.S. 509, 531 (2004).  An accommodation is reasonable if "it does not

impose undue financial or administrative burdens or 'fundamentally alter the nature of the service, program or activity.'" *Cadena,* 946 F. 3d at 724 (quoting 28 C.F.R. §35.130(b)(7)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc,* 792 F. 3d 584, 596 n. 9 (5th Cir. 2015). Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms. *Windham v. Harris County,* 875 F. 3d 229, 234 (5th Cir. 2017). When a plaintiff fails to request an accommodation such as in this case, he can only prevail by showing that the "disability, resulting limitation, and necessary reasonable accommodation were "open, obvious and apparent to the entity's relevant agents." *Id.* (quoting *Taylor v. Principle Fin. Grp., Inc.,* 93 F. 3d 155, 165 (5th Cir. 1996)).

Even when plaintiffs successfully prove a disability-discrimination or a failure-to-accommodate claim, they "may only recover compensatory damages upon a showing of intentional discrimination." *Delano – Pyle,* 302 F. 3d at 574; accord *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F. 3d 565, 574 (5th Cir. 2018). The controlling case law has established that "intent requires that the defendant at least have actual notice." *Miraglia,* 901 F. 3d at 575. It is critical to note that "unlike other circuits, the 5th Circuit has not held that deliberate indifference suffices. The plaintiff must prove intentional discrimination. *Id.*; See also *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.,* 729 F. 3d 248, 262-63 (3d Cir. 2013)(collecting, and agreeing with, cases from five (5) other circuits).

It is clear that the Plaintiff has plead this as a failure-to-accommodate claim. Plaintiff has identified a number of different potential accommodations that, she claims, would have saved Brittain from an attempted suicide, and the resulting injuries. These will be discussed individually.

However, the evidence produced by the Plaintiff has failed to show that any City of Seven Points employee intentionally discriminated against Brittain by failing to provide these accommodations.

Perhaps, however, any analysis of this ADA claim should begin with the fundamental question of whether the Plaintiff has established that Cody Brittain was a qualified individual with a disability.  During the arrest, and while being booked-in by Officer Gomez, Brittain showed no sign of being disabled.  His only request was that he be allowed to smoke a cigarette.  Throughout his detention, the evidence establishes that Brittain made numerous requests for a cigarette (App. 5).  Defendant Bee testified that he only became agitated during her shift when he was continually denied a cigarette.  There is no evidence to establish that a strong desire for a cigarette constitutes a disability.  Officer Gomez testified that Brittain was calm from the time of his arrest until Gomez completed his shift, and that he showed no signs of mental illness, instability, or suicidal tendencies.  (App. 1).  The only evidence in the record that even suggests that Cody Brittain had a mental illness was the statement by his counselor, Rachel, to Sergeant Brandon Young during a telephone call that "she believed he had exhibited some signs of schizophrenia." However, Brandon Young testified that, based upon his knowledge of the House of Benjamin, Rachel did not have medical credentials and had not made a diagnosis of schizophrenia.  This was the only arguable evidence of mental illness, however, there is no evidence establishing that Brittain indeed suffered from any mental illness.  Therefore, Plaintiff has failed to establish the initial element of a failure to accommodate claim.

Likewise, the Plaintiff has failed to establish that this alleged disability and its consequential limitations were known by any employee of the Defendant City.  The evidence is undisputed that Brittain never identified any alleged disability.  (App. 1, App. 2, App. 3).  There is no evidence that he mentioned any "resulting limitations" that he suffered from, and specifically denied having any suicidal tendencies.  (App. 1).  In fact, Officer Gomez, who conducted the book-

Brief in Support of Defendants' Motion for Summary Judgment. No. 3:18cv02192X  P a g e  | **44**

in questioning, testified that Brittain denied having any physical or mental conditions or illnesses which he was asked about. (App. 1). Neither were his disability, resulting limitations and necessary reasonable accommodations "open, obvious and apparent" to any employee of Defendant City. (App. 1, App. 2, App. 5). If the Defendants do not have actual notice, there can be no intent as a matter of law. *Miraglia,* 901 F. 3d at 575. Plaintiff's claims for a violation of the ADA by Defendant City fails due to her failure to produce evidence supporting these first two required elements of a failure-to-accommodate claim.

13.    Plaintiff's claim of "inadequate supervision" is not supported by the evidence.

Plaintiff generally claims that Defendant breached its duty to provide Chelsea Bee-Taylor with adequate supervision. Again, Plaintiff has offered no evidence to support this contention.

A municipality can only be held liable for inadequate supervision under §1983 "if it supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens." *Doe v. Taylor Indep. Sch. Dist.,* 15 F. 3d 443, 453 (5th Cir. 1994) (applying the standards of *Canton v. Ohio* to failure to supervise allegations). A plaintiff must show that: (1) the supervisor failed to supervise; (2) a causal link exists between the failure to supervise and the violation of rights; and (3) failure to supervise amounts to deliberate indifference. *Smith v. Brenoettsy,* 158 F. 3d 908, 911-12 (5th Cir. 1998). To prevail on a failure to supervise claim, a plaintiff must identify the supervisor who allegedly failed to perform the necessary duties and demonstrate that the identified individual(s) "had subjective knowledge of a serious risk of harm to the victims [or a category of people]." *Atteberry,* 430 F. 3d at 255.

The Plaintiff has offered no evidence that the City of Seven Points utilized any supervisory procedures or policies that were inadequate, or that the City of Seven Points was deliberately indifferent to the supervision of its police officers. More importantly, Plaintiff can produce no evidence that inadequate supervision was the *direct cause* or the moving force of his alleged

injuries. Plaintiff's claims regarding inadequate supervision are totally baseless, and he submits no evidence of any type to support this claim. Plaintiff offers no evidence to establish that inadequate supervision of Defendant Chelsea Bee-Taylor was the direct cause of Plaintiff's alleged unlawful arrest. Further, supervisor Defendant Box reviewed reports and investigation conducted in this case. She agreed that probable cause existed to arrest the Plaintiff (App. I). Accordingly, summary judgment on Plaintiff's claim of inadequate supervision is warranted as a matter of law.

## VIII.
## <u>CONCLUSION</u>

15.     The Plaintiff bears the burden of proof on the causes of action asserted against Defendant City of Seven Points as described herein. Defendants have identified the elements of those causes of action on which there is no genuine issue of material fact. Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257; and *Little,* 37 F. 3d 1069, 1075. The nonmovant's burden is not satisfied by some "metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, or "only a scintilla of evidence." *Little,* 37 F. 3d at 1075; See *Douglass v. United Serv. Auto. Ass'n,* 79 F. 3d 1415, 1429 (5th Cir. 1996) citing *Forsyth v. Barr,* 19 F. 3d 1527, 1533 (5th Cir.), cert denied, 513 U.S. 871 (1994). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to their case on which they bear the burden of proof at trial. *Celotex Corp.,* 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In the present case, the Plaintiff

has offered no evidence supporting his claims against Defendant City of Seven Points.  Therefore, Defendant is entitled to summary judgment on all of Plaintiff's claims.

## IX
## **PRAYER**

Wherefore, PREMISES CONSIDERED, Defendants, The City of Seven Points, Texas, Defendant Gomez, Defendant Young, Defendant Wennerstrom, and Defendant Bee-Taylor pray that this Court grant this Motion for Summary Judgment in its entirety, that Plaintiff takes nothing by way of this suit, and that all relief requested by Plaintiff be denied.  Defendants also pray that they recover all attorneys' fees and costs pursuant to 42 USC §1988, and for such other relief to which it may show themselves entitled.

Respectfully submitted,

**RITCHESON, LAUFFER & VINCENT**
A Professional Corporation

TWO AMERICAN CENTER
821 ESE Loop 323, Ste. 530
Tyler, Texas 75701
(903) 535-2900


By:     /s/ Lance Vincent_____
**LANCE VINCENT**
State Bar No. 20585580
lancev@rllawfirm.net

**DOUGLAS A. RITCHESON**
State Bar No. 24076650
dougr@rllawfirm.net

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Northern District of Texas on this 29th day of June, 2020.

By: /s/ Lance Vincent
LANCE VINCENT

**VIA ELECTRONIC SERVICE**
**Jeff Edwards**
The Edwards Law Firm
1101 E. 11th Street
Austin, TX 78702
512-623-7727
Fax: 512-623-7729
Email: jeff@edwards-law.com

**Scott Medlock**
Edwards Law
1101 East 11th Street
Austin, TX 78702
Email: scott@edwards-law.com

**Darren K. Coleman**
BOON CALK ECHOLS COLEMAN & GOOLSBY, P.L.L.C.
1800 NW LOOP 281, SUITE 303
Longview, Texas 75604
Email: darren.coleman@boonlaw.com

## TABLE OF AUTHORITIES

### Cases

42 U.S.C. § 1983                                      2,25,28,29,31,35,36,38,46

42 U.S.C. §12101(b)(1)                                                      43

42 U.S.C. §12131(1)                                                         43

Title II of Americans with Disabilities Act § 504 Rehabilitation Act     42,43

Texas Administrative Code Title 37 Cp. 251 Rule 251.1                       31

Texas Administrative Code Title 37 Cp. 251 Rule 275.1                       31

Tex. Gov't Code § 511.009(a)(1)                                            31

*Alexander v. Choate,* 469 U.S. 287, 295 n. 13 (1985)                       42

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)             4,5,46

*Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)                             6

*Atteberry,* 430 F. 3d at 255                                              45

*Bd. Of the County Comm'ns of Bryan County v. Brown,* 520 U.S. 397, 407, 117 S. Ct. 1382

(1997)                                                                     34

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996)                         3

*Ball v. LeBlanc,* 792 F. 3d 584, 596 n. 9 (5th Cir. 2015)                 43

*Baranowski v. Hart,* 486 F. 3d 112, 119 (5th Cir. 2007)                    5

*Barlow v. Owens, 400 F. Supp. 2d 980, 984 (S.D. Tex. 2005)*               20

*Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed. 2d 447 (1979)   31,34

*Bennett v. City of Slidell,* 728 F. 2d 762, 767 (5th Cir. 1984)       32,35,36

*Bennett – Nelson v. La. Bd of Regents,* 431 F. 3d 448, 454 (5th Cir. 2005)  42

*Boudreaux* v. *Swift Transp. Co.,* 402 F. 3d 536, 540 (5th Cir. 2005)      5

*Bryan County v. Brown,* 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626

(1997)                                                          27,28,31,32,34,35

*Brumfield v. Hollands,* 551 F. 3d 322, 331 (5th Cir. 2008) 34

*Burns v. City of Galveston,* 905 F. 2d 100 (5th Cir. 1990) 29,31

*Cadena,* 946 F. 3d at 724 (quoting 28 C.F.R. §35.130(b)(7) 43

*Callis v. Sellars,* 931 F. Supp. 504, 505 (S.D. Tex. 1996) 28

*Canton v. Ohio* 45

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) 4, 5,46

*City of Canton v. Harris*, 489 U.S. 378, 388-89, 09 S.Ct. 1197 (1989) 37

*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-824 (1985) 36

*Converse v. Kemah,* 2020 U.S. App. LEXIS 18607 8,22

*Delano-Pyle v. Victoria County,* 302 F. 3d 567, 574 (5th Cir. 2002) 42,43

*Doe v. Taylor Indep. Sch. Dist.,* 15 F. 3d 443, 453 (5th Cir. 1994) 45

*Domino v. Tex. Dep't of Criminal Justice,* 239 F. 3d 752, 756 (5th Cir. 2001) 23,38

*Douglas v. United Servs. Auto Association,* 79 F. 3d 1415, 1429 (5th Cir. 1996) 4,46

*Duffy v. Leading Edge Products,* 44 F. 3d 308, 312 (5th Cir. 1995) 5

*Durrell v. Lower Merion Sch. Dist.,* 729 F. 3d  248, 262-63 (3d Cir. 2013) 43

*Estelle v. Gamble, 429 U.S. 97, 103 (1976)* 23

*Evans v. Marlin,* 986 F. 2d 104, 108, (5th Cir. 1993) 31

*Farmer v. Brennan, 511 U.S. 825, 837 (1994)* 3,8,21,33,38,39

*Flores v. City of Palacios,* 381 F. 3d 391, 395 (5th Cir. 2004) 6

*Flores v. County of Hardeman, Tex.,* 124 F. 3d 736, 738 (5th Cir. 1997) 29

*Forsyth v. Barr,* 19 F. 3d 1527, 1537 (5th Cir. 1994) 5,46

*Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir. 1992) 36

*Garza v. City of Donna,* 922 F. 3d 626, 635 (5th Cir. 2019) 33

*Gonzalez v. Ysletta Independent School District,* 996 F. 2d 745, 755 (5th Cir. 1993) 27

*Graham v. Conner,* 490 U.S. 386 (1989) 3

*Gray v. Tunica County,* 279 F. supp 2d 789, 794 (N. D. Miss. 2003)                          39

*Griggs v. Brewer,* 841 F. 3d 308, 312 (5th Cir. 2016)                          6

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)                          5

*Hare v. City of Corinth, Miss.,* 74 F. 3d 633, 643 (5th Cir. 1996)          7,8,9,24,29,33,38,39

*Irugas v. Bruce,* 623 F. App'x 240, 240-41 (5th Cir. 2015)                          33

*Jacobs v. W. Feliciana Sheriff's Dep't,* 228 F.3d 388, 393 (5th Cir. 2000)                          7,8

*Jett v. Dallas Independent School District,* 491 U.S. 701, 729, 109 S. Ct. 2702, 105 L. Ed. 2d 598
(1989)                          28

*Johnson v. Deep E. Tx. Reg'l Narcotics Task Force, 379 F.3d 293 (5th Cir. 2004)*          35,36,37

*Jones v. Diamond,* 594 F.2d 997, 1011 (5th Cir. 1979)                          30

*Leffall v. Dallas Independent School Dist.,* 28 F.3d 521, 525 (5th Cir. 1994)                          34

*Little v. Liquid Air Corp.,* 37 F. 3d 1069, 1075 (5th Cir. 1994)                          4,46

*Lopez v. Houston Independent School District,* 817 F. 2d 351, 354 (5th Cir. 1987)                          26

*Lower Merion Sch. Dist., 729 F. 3d 248, 262-63 (3d Cir. 2013)*                          37

*Luna v. Mullenix,* 773 F. 3d 712, 718 (5th Cir. 2014)                          6,7

*Lytle v. Bexar County,* 56 F. 3d 404, 410 (5th Cir. 2009)                          6

*McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)                          33

*McKee v. City of Rockwall,* 877 F. 2d 409, 415-16 (5th Cir. 1989)                          26

*MacDonald v. City of Freeport,* 834 F. Supp. 921, 934 (E.D. Tex. 1993)                          26

*Matsushita Elec. Indus. Co. v. the Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)                          5

*Malley v. Briggs,* 475 U.S. 335, 341 (1986)                          6

*Meadowbriar Home for Children, Inc. v. Gunn,* 81 F. 3d 521, 532-33 (5th Cir. 19996)                          30

*Melton v. Dall. Area Rapid Transit,* 391 F. 3d 669, 671-72 (5th Cir. 2004)                          36

*Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F. 3d 565, 574 (5th Cir. 2018)          36,38

*Monell v. New York Dep't of Social Services,* 436 U.S. 658, 690-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611
(1978)                          26,27,28,29,30,31,32,33,34,35

*Morgan v. Swanson,* 659 F. 3d 359, 371-72 (5th Cir. 2011)    6

*Mosser v. Haney,* 2005 W.L. 1421440, *3 (N.D. Tex. June 17, 2005)    26

*Olabisiomotosho v. City of Houston,* 185 F. 3d 521, 528-29 (5th Cir. 1999)    32

*O'Quinn v. Manuel,* 773 F. 2d 605, 610 (5th Cir. 1985)    34

*Pearson v. Callahan,* 555 U.S. 223, 236 (2009)    6,7

*Pfannsteil v. City of Marion,* 918 F. 2d 1178, 1183 (5th Cir. 1990)    7

*Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002)    33

*Posey v. Southwestern Bell Tel. Lp, 430 F. Supp. 2d 616 (N.D. Tex. 2006)*    25

*Richardson v. Oldham,* 12 F.3d 1373, 1381-82 (5th Cir. 1994)    35

*Sanchez v. Young County, Tex.,* 866 F. 3d 274, 279 (5th Cir. 2017)    27

*San Jacinto Sav. & Loan v. Kacal,* 928 F. 2d 697, 701 n. 4 (5th Cir. 1991)    22

*Scott v. Moore,* 114 F. 3d 51, 53 (5th Cir. 1997)    31

*Sibley v. Lemaire,* 184 F. 3d 481, 489 (5th Cir. 1999)    33

*Smith v. Brenoettsy,* 158 F. 3d 908, 911-12 (5th Cir. 1998)    38

*Spiller v. City of Texas City,* 130 F. 3d 162 (5th Cir. 1997)    30

*Stanton v. Sims,* 134 S. Ct. 3, 5 (2013)    5

*Tarver v. Edna,* 410 at 750.)    6

*Tolan v. Cotton,* 572 U.S. 650, 655-65 (2104)    6

*Taylor v. Principle Fin. Grp., Inc.,* 93 F. 3d 155, 165 (5th Cir. 1996)    36

*Tennessee v. Lane,* 541 U.S. 509, 531 (2004)    36

*Thompson v. Upshur Cty.,* 245 F. 3d 447, 460 (5th Cir. 2001)    23,24

*Valle v. City of Houston,* 613 F. 3d 536, 541-42 (5th Cir. 2010)    26

*Whitley v. Hanna,* 726 F. 3d 631, 638 (5th Cir. 2013)    6

*Woodard v. Andrus,*  419 F. 3d 348, 352 (5th Cir. 2005)    26

*Webster v. City of Houston,* 735 F. 2d 838, 841 (5th Cir. 1984)    29

*Whitt v. Stephens Cty,* 236 F. App'x 900, 903 (5th Cir. 2007)                                      29

*Windham v. Harris County,* 875 F. 3d 229, 234 (5th Cir. 2017)                              36

*Wyatt v. Fletcher,* 718 F. 3d 496, 502 (5th Cir. 2013)                                              6