UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STACIE NUSS, AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF CODY BRITTAIN, | § § § § | |
| *Plaintiff,* | § § | |
| | § | Civil Action No. 3:18-CV-02192-X |
| v. | § § | |
| CITY OF SEVEN POINTS, TEXAS, et al., | § § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

This case arises from Cody Brittain's attempted suicide while detained at a holding facility in Seven Points, Texas. Officer Matthew Greiner, individually, and the City of Seven Points, with all other defendants, filed motions for summary judgment. After careful consideration, and as explained below, the Court **GRANTS** the defendants' motions for summary judgment and **DISMISSES** Stacie Nuss's claims.

### I. Background

In 2016, Officer Francisco Gomez arrested Cody Brittain on a warrant out of Henderson County. Gomez transported him back to the holding facility in Seven Points to await pickup from Henderson County the following morning. During the night, Brittain attempted suicide by hanging. EMS restored his pulse, but he suffered severe anoxic brain damage and died approximately two years later from related injuries. Stacie Nuss was Brittain's aunt, and she raised him. As independent

1

administrator of Brittain's estate, Nuss brings this suit against Chief Raymond Wennerstrom, Jr., Sergeant Brandon Young, Officer Matthew Greiner, Officer Francisco Gomez, and dispatcher Chelsea Bee-Taylor under 28 U.S.C. § 1983, alleging violations of Brittain's right to protection from a known risk of suicide under the 14th Amendment.  She also brings suit against the City of Seven Points, Texas (Seven Points) on conditions-of-confinement, episodic-act, and failure-to-train theories of liability under 28 U.S.C. § 1983 and the Americans with Disabilities Act (Disabilities Act) and Rehabilitation Act.

Defendant Greiner filed his own motion for summary judgment.  Seven Points and all other defendants filed a separate motion for summary judgment.  The Court held a hearing on the ripe motions.

## II. Legal Standard

Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  "A fact is material if it 'might affect the outcome of the suit'" and a "factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[2]

---

[1] FED. R. CIV. P. 56(a).

[2] *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Pretrial detainees have a Fourteenth Amendment right to protection from a known risk of suicide.[3]  Jailers violate this right when they gain actual knowledge of the risk of suicide and respond with deliberate indifference.[4]  Actual knowledge requires that an officer "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . [actually] draw the inference."[5]  The argument that an officer "should have known" of a substantial risk does not suffice to establish actual knowledge.[6]  An officer is deliberately indifferent to a risk when he or she "[fails] to take reasonable measures to abate it."[7]  In short, to present a cognizable claim, the plaintiff must offer facts which show that the officer was (1) actually aware of a substantial risk of serious harm and (2) deliberately indifferent to that risk.

Qualified immunity is a two-step analysis.[8]  Typically, the Court first asks "whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights."[9]  If there was a violation, the Court then asks "whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in

---

[3] *Branton v. City of Moss Point*, 261 Fed.Appx. 659, 661 (5th Cir. 2008).

[4] *Converse v. City of Kemah, Texas*, 961 F.3d 771, 775 (5th Cir. 2020).

[5] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[6] *Id.* at 843 n.8.

[7] *Hare v. City of Corinth (Hare II)*, 74 F.3d 633, 648 (5th Cir. 1996) (quoting *Farmer* 511 U.S. at 847) (internal quotation marks omitted).

[8] *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).

[9] *Id.*

3

question."[10]   A right is clearly established when precedent places "the statutory or constitutional question beyond debate."[11]   The plaintiff bears the burden of proving that the defense of qualified immunity does not apply.[12]

### III. Analysis

The Court considers each motion for summary judgment separately.

### A. Defendant Officer Greiner's Motion for Summary Judgment

#### 1. Facts

On the date of Brittain's attempted suicide, Officer Greiner was an on-duty police officer employed by Seven Points.  He arrived at the police department for his shift as Officer Gomez was booking Brittain.  Officer Greiner heard Officer Gomez asking Brittain standard book-in questions, including whether he: was sick, had taken any pills, was intoxicated, had recently been injured, etc.  Officer Greiner noticed that Brittain was "acting out and being a little difficult,"[13] but he did not find this unusual for an arrestee.  When asked whether he had any suicidal tendencies, Officer Greiner claims that Brittain responded "No."[14]  Officer Greiner does remember, however, that Brittain stated he had "head problems" or "was messed up in the head."[15]  But Officer

---

[10] *Id.* at 411.

[11] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[12] *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012).

[13] [Doc. No. 53 at 9].

[14] *Id.* at 10.

[15] *Id.* at 9.

Greiner alleges that he "had no idea what Brittain was referring to from these statements."[16]

Because Officer Gomez was going off-duty, Officer Greiner escorted Brittain to his cell.  While on patrol later that evening, Officer Greiner received a call from dispatcher Bee-Taylor, notifying him that Brittain was "acting rowdy."[17]  Officer Greiner notified Officer Young, the supervisor on duty, who proceeded to the police department to handle the situation.  Because he thought Officer Young might need assistance, Officer Greiner also returned to the police department.  After Officer Young allowed Brittain to make a phone call to his counselor at a drug rehabilitation facility, Brittain calmed down.  Officer Greiner continued to periodically check on Brittain during the evening.  At 12:32 AM, Officer Greiner noted in the log sheet that Brittain was "sitting on floor awake, said he's fine."[18]

Officer Greiner left the police department to follow up on a case about twenty minutes away from Seven Points.  While he was out, Bee-Taylor called Officer Greiner and notified him that Brittain was threatening to harm himself.  Officer Greiner directed Bee-Taylor to immediately call the Tool Police Department.[19]  Officer Greiner then received a call from Young, notifying him that Brittain attempted to hang himself.  Officer Greiner returned to the police department.

---

[16] *Id.* at 10.

[17] *Id.* at 11.

[18] *Id.* at 12.

[19] The City of Seven Points and the nearby City of Tool had a mutual aid agreement in place, and the Tool police department was only a few minutes away from the police department, enabling it to respond faster than Officer Greiner.

## 2. Claims

Nuss alleges that Greiner is liable under section 1983 for violating Brittain's Fourteenth Amendment right to protection from a known risk of suicide. To prevail on her claim, Nuss must first allege that Officer Greiner had actual knowledge of a substantial risk that Brittain might commit suicide.[20] That requires a showing that (1) Officer Greiner was aware of facts from which he could draw the inference that there was a substantial risk of serious harm, and (2) Officer Greiner *actually* drew that inference. The evidence here shows that Officer Greiner watched the book-in process, overheard Brittain state he was "messed up in the head," checked on him periodically, and directed Bee-Taylor to call the Tool Police Department when he learned Brittain was threatening self-harm.

Because this is a motion for summary judgment, the Court views the evidence in the light most favorable to Nuss. But the evidence here does not show a genuine dispute of material fact which would suffice to defeat summary judgment. The only evidence Nuss might be able to identify to allege that Greiner had actual knowledge is: (1) his statement that he heard Brittain say he had "head problems" and was "messed up in the head,"[21] and (2) the Bee-Taylor phone call notifying Greiner that Brittain threatened to harm himself. The other facts cannot conceivably be a basis for drawing an inference of the existence of a serious medical need.

---

[20] *Converse*, 961 F.3d at 775.

[21] [Doc. No. 53 at 9].

6

The book-in statement Officer Greiner overheard is insufficient to draw an inference of a serious medical need.  Officer Greiner had not even interacted directly with Brittain at this point; he merely overheard Brittain's response to a book-in question.  Importantly, "[p]olice officers are not psychiatrists . . . ."[22]  Without ever speaking to Brittain, Greiner cannot be expected to "distinguish between a mental illness or handicap on one hand and drug-induced or simply obnoxious behavior on the other in a matter of seconds."[23]  Indeed, even Nuss, who raised Brittain, testified that she did not believe he had any suicidal tendencies:

Q.    Did you ever warn anybody that Cody might be suicidal?

A.    No. Cody's – is not suicidal in my opinion.  He's never threatened to harm himself.  He's never threatened to kill himself.

Q.    Did you ever have a conversation with him about the topic of suicide?

A.    Yeah.  Cody's scared of death.[24]

If the woman who raised Brittain did not believe he was suicidal, knowing his medical and mental history, it seems implausible that overhearing a snippet of conversation would impute that knowledge to Officer Greiner.  And even if this overheard statement was sufficient to draw an inference of a serious medical need, Officer Greiner would still need to *actually* draw that inference to have actual

---

[22] *Barlow ex rel Moncebaiz v. Owes*, 400 F.Supp.2d 980, 984 (S.D. Tex. 2005).

[23] *Id.*

[24] [Doc. No. 54 at 31].

knowledge.  He did not.  Instead, Greiner stated: "I had no idea what Mr. Brittain was referring to from these statements."[25]

The only point at which the evidence might show Greiner had actual knowledge of a substantial risk of serious harm is when Bee-Taylor called Greiner and notified him that Brittain was threatening to harm himself.  Greiner stated that he believed Bee-Taylor told him: "Brittain said he was going to hang himself."[26] Learning of a threat of hanging is certainly a fact from which an inference can be drawn that there is a substantial risk of harm.  And Greiner's actions in directing Bee-Taylor to call the Pool Police department demonstrate that he drew the inference that a threat of harm existed.

But even if Officer Greiner had actual knowledge at that point, he did not act with deliberate indifference.  Deliberate indifference only occurs when an official "[fails] to take reasonable measures to abate" a known risk.[27]   "'Deliberate indifference' is a stringent standard of fault . . . ."[28]  Because he was twenty minutes away from Seven Points at that time, Officer Greiner assisted in the only way he could: by instructing Bee-Taylor to call on another, closer police department.  And he also returned to the jail.  These were reasonable measures which do not rise to the "stringent standard" of deliberate indifference.

---

[25] Def.'s App. at 2, ¶ 5.

[26] *Id*. at 4, ¶ 13.  The defendants disagree regarding whether Bee-Taylor told Officer Greiner that Brittain was threatening to "hang" himself or threatening to "harm himself."

[27] *Hare II*, 74 F.3d at 648.

[28] *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

Viewing the evidence in the light most favorable to Nuss, there exists no genuine dispute of material fact to defeat Officer Greiner's motion for summary judgment. Nuss cannot show that Officer Greiner violated Brittain's 14th Amendment right to protection from a known risk of suicide. For almost the entire night, Greiner had no actual knowledge that a threat of serious harm existed, and when he finally was aware, he did not act with deliberate indifference. Because there is no evidence of a constitutional violation, the Court does not conduct a qualified-immunity analysis. Therefore, the Court **GRANTS** Greiner's motion for summary judgment.

>B. Defendants Seven Points, Gomez, Young, Wennerstrom,
>    and Bee-Taylor's Motion for Summary Judgment

The Court considers the claims against Seven Points and the individual defendants separately.

>1. Individual Defendants

Nuss alleges that the individual defendants are liable under section 1983 for violating Brittain's 14th Amendment right to protection from a known risk of suicide. As explained above, to prove a constitutional violation, Nuss must allege that each defendant had actual knowledge that there was a substantial risk of serious harm and responded to that risk with deliberate indifference. And if she satisfies the 14th Amendment standard, Nuss must also overcome the qualified-immunity defense by

showing that "the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."[29]

Viewing the evidence in the light most favorable to Nuss, there is no genuine dispute of material fact concerning whether the defendants violated the 14th Amendment.  The majority of the evidence shows that there were no facts from which defendants could draw an inference of a risk of serious harm.  And in the narrow circumstances in which the defendants could draw that inference, there is no evidence they responded with deliberate indifference.

### i. Facts

Officer Gomez arrested Brittain on a warrant out of Henderson County. Officer Young spoke with Brittain briefly and gave him a bottle of water before Officer Gomez transported him to the Seven Points police department.  Officer Young asked Brittain whether he was "high," and Brittain responded that he was not.[30]  Officer Gomez booked Brittain, asking him the medical questions he was trained to ask when working for the county jail.  Officer Gomez alleges that Brittain denied having any suicidal tendencies.  Unlike Officer Greiner, Officer Gomez does not recall Brittain stating he had "head problems."[31]  Officer Gomez noticed nothing that caused him to suspect Brittain was at risk of serious harm.

After Officer Gomez booked Brittain, Officer Greiner led Brittain to the holding cell.  Officer Young went back on patrol but returned to the police department when

---

[29] *Freeman*, 483 F.3d at 411.

[30] [Doc. No. 56 at 11].

[31] [Doc. No. 53 at 9].

Bee-Taylor notified him that Brittain wanted to speak with him.  Officer Young allowed Brittain to call his counselor at a drug-rehabilitation facility.  Officer Young also spoke with the counselor, who advised him that "she had observed some symptoms of possible mental illness in Brittain."[32] Officer Young left the police department again and had no further contact with Brittain for the duration of his shift.

Bee-Taylor, the dispatcher, was responsible for monitoring Brittain while the officers were on patrol.  She monitored the holding cell from a television monitor, in addition to making personal checks.  At one point, she observed Brittain laying on the floor and slapping his hands on the ground.  Later that evening, he began shaking the bars on the cell and asking for a cigarette.  He then hung his blanket over the cell to block the view.  Bee-Taylor directed him to remove it.  When Brittain threatened to "bang his head on the wall,"[33] she called the Tool police department, Officer Young, and Officer Greiner.  Officer Young advised Bee-Taylor to tell the Tool police officers to remove Brittain from the cell and cuff him to the book-in bench.  Officer Young called Chief Wennerstrom, who was not aware that Brittain had been booked, to advise him of the situation.  When the Tool officer arrived, he first stopped to use the restroom.  Bee-Taylor then accompanied him to Brittain's cell, where they discovered he had hung himself.  After summoning EMS, Bee-Taylor called Officer Young, and Officer Young notified Chief Wennerstrom and Officer Greiner.

---

[32] [Doc. No. 56 at 12].

[33] Def.'s App'x. at 16.

11

ii. Claims

For Nuss's claims to survive summary judgment, there must be a genuine dispute of material fact.  There is none here.  The initial inquiry, as explained above, is whether the defendants had actual knowledge that a substantial risk of serious harm existed.[34]  Actual knowledge requires that (1) facts existed from which the inference that a substantial risk of serious harm existed could be drawn, and (2) the defendants actually drew that inference.[35]  And if the defendants had actual knowledge, there must still be evidence that they responded with deliberate indifference to show a violation of the 14th Amendment.[36]  Nuss's claims against the individual defendants do not survive summary judgment because there is no genuine dispute of material fact concerning this 14th Amendment inquiry.

***Officer Gomez.***  Officer Gomez arrested and booked Brittain.  Officer Gomez claims that Brittain denied having suicidal tendencies.  Viewing the evidence in the light most favorable to Nuss, the Court assumes that Brittain did state he had "head problems" during book-in, as Officer Greiner alleges (although Officer Gomez denies hearing this).  This interaction is not sufficient to draw an inference that a substantial risk of serious harm existed.  As explained above, even Nuss did not believe that Brittain had suicidal tendencies. It's implausible to expect Officer Gomez to draw that inference in such a short period, after Brittain expressly denied having suicidal tendencies.  Even psychiatrists cannot always "distinguish between a mental illness

---

[34] *Farmer*, 511 U.S. at 837.

[35] *Id.*

[36] Def.'s App'x. at 4.

or handicap on one hand and drug-induced or simply obnoxious behavior on the other in a matter of seconds."[37]  And police are not psychiatrists.[38]

Even if facts existed from which the inference could be drawn, Gomez would still need to *actually* draw that inference.  There is no evidence that he did.  Because the evidence does not raise a genuine dispute of material fact regarding whether Gomez had actual knowledge of a substantial risk of serious harm, the Court does not reach the deliberate indifference prong or the question of qualified immunity.

***Officer Young***.  Officer Young briefly spoke with Brittain after Officer Gomez arrested him.  Brittain expressly denied being "high."[39]  Officer Young spoke again with Brittain during the evening and spoke with his counselor.  The counselor advised Officer Young that Brittain might be suffering from mental health issues and/or schizophrenia.  The only evidence here which might allow Officer Young to have drawn an inference of a substantial risk of serious harm is his conversation with the counselor.  But even that is a stretch.  There is no evidence that the counselor made a diagnosis of schizophrenia; there is no evidence that she indicated Brittain was a danger to himself, or should be transferred to a mental health facility; there is no evidence she opposed Brittain being picked up the following morning by Henderson County; there is no evidence of her qualifications to make medical diagnoses or treatment recommendations; there is not even evidence of her last name.  This phone

---

[37] *Barlow*, 400 F.Supp.2d at 984.

[38] *Id.*

[39] Def.'s App'x. at 5.

call simply does not create facts from which Officer Young could draw the inference that a substantial risk of serious harm existed.

When Bee-Taylor called Officer Young to tell him that Brittain was threatening to harm himself, Officer Young then became aware of a substantial risk of serious harm. But he did not respond with deliberate indifference. A finding of deliberate indifference would require that Officer Young failed to take any measures to abate the risk. He did not. He advised Bee-Taylor, called Chief Wennerstrom, and called Henderson County for an immediate transfer. Those are all reasonable actions taken to abate the risk of serious harm, indicating Officer Young was not deliberately indifferent. Because there is no genuine dispute of material fact concerning the existence of a constitutional violation, the Court does not reach a qualified-immunity analysis.

***Chief Wennerstrom***. Chief Wennerstrom was not present when Brittain was booked; he wasn't even aware that Brittain was brought in to the Seven Points police department. With these facts, Nuss cannot seriously argue that Chief Wennerstrom was aware that Brittain was at substantial risk of serious harm. And without knowledge of facts enabling him to draw the inference, it was impossible for him to *actually* draw that inference. Chief Wennerstrom did not learn of Brittain's incarceration until Officer Young called him to notify him that Brittain was threatening to harm himself. When Officer Young called, Chief Wennerstrom agreed with the plan of action to call Henderson County for an immediate transfer. Advising Officer Young on how to respond, after just learning of Brittain's incarceration, does

not rise to the "stringent standard" required to show deliberate indifference.[40] Because there is no genuine dispute of material fact regarding the existence of a constitutional violation, the Court does not reach a qualified-immunity analysis.

***Dispatcher Bee-Taylor***.   Bee-Taylor checked on Brittain throughout the evening.  She forwarded his requests to Young and notified the officers when Brittain needed assistance.  She observed Brittain laying down and slapping his hands on the ground at one point.  When he threatened to harm himself after not getting a cigarette by "bash[ing] his head in against the cell door and get[ting] blood everywhere,"[41] she talked with him and then called for assistance.  Nuss has presented no evidence which suggests that Bee-Taylor was aware of a known risk of suicide.  Until Brittain threatened to bang his head on the bars, she was not even aware of a risk of harm. And at the point she became aware of a risk of harm, Bee-Taylor contacted the Tool police department for help and the Seven Points officers for advice.  This is not evidence that Bee-Taylor responded with deliberate indifference.  Indeed, she took reasonable actions to abate the risk of harm.  Even if her actions were not necessarily the perfect response, as Nuss claims, they do not rise to the high standard of deliberate indifference.[42]   Because there is no genuine dispute of material fact concerning the existence of a constitutional violation, the Court does not reach a qualified-immunity analysis.

---

[40] *Brown*, 520 U.S. at 410.

[41] [Doc. No. 56 at 15].

[42] As the Supreme Court recognized in *Farmer*, deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence," one that is akin to criminal recklessness.  *See Farmer*, 511 U.S. at 835, 839–40.

15

For Nuss's claims to survive summary judgment, there must be some dispute of material fact.  No dispute exists here with respect to the remaining individual defendants.  In the few circumstances in which the defendants could have drawn the inference that a substantial risk of serious harm existed, they did not respond with deliberate indifference.  Even viewing the evidence in the light most favorable to Nuss, the defendants did not violate Brittain's 14th Amendment right to protection from a known risk of suicide.  Because there is no genuine dispute of material fact regarding the existence of a constitutional violation, the remaining individual defendants are entitled to summary judgment.

## 2. Seven Points

Nuss raises claims against Seven Points for violations of section 1983, the Disabilities Act, and the Rehabilitation Act.  Under section 1983, Nuss specifically alleges conditions-of-confinement, episodic-act, and failure-to-train liability. Municipal liability under section 1983 arises only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible . . . ."[43]  "A plaintiff must identify: '(1) an official policy (or custom) of which (2) a policymaker may be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom.'"[44]

---

[43] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[44] *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010).

*Claim 1: Conditions of Confinement*.  Conditions-of-confinement liability arises when a condition of confinement amounts to punishment.  "Because a state may not punish a pretrial detainee, conditions of confinement for such an inmate that amount to 'punishment' violate the Constitution."[45]   In cases grounded in unconstitutional conditions of confinement, "the plaintiff need only show that such a condition, which is alleged to be the cause of a constitutional violation, has no reasonable relationship to a legitimate government interest."[46]  The plaintiff does not need to show an actual intent to punish because it may be inferred "from the decision to expose a detainee to an unconstitutional condition."[47]  The condition must be more than a *de minimis* violation, however.  For example, "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate. . . .  Rather, a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for . . . basic human needs."[48]

Here, Nuss claims Seven Points engaged in four practices that lacked a reasonable relationship to a legitimate government interest: (1) understaffing; (2) the lack of a suicide-restraint cell; (3) failure to comply with jail standards; and (4) underfunding.

---

[45] *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 206 (5th Cir. 2011).

[46] *Id.* at 207.

[47] *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009).

[48] *Id.* at 454.

**Understaffing**.  Nuss relies on *Shepard v. Hansford County, Texas*[49] to argue that "the Northern District of Texas has denied summary judgment in virtually identical cases where jails had insufficient staff to protect inmates from suicide."[50] *Shepard* is not virtually identical.  There, the detainee notified the jailer that she had had thoughts of killing herself in the past year.[51]  The jailer marked that she was at risk due to a "mental illness or medical condition," and she was placed on suicide watch.[52]  The jailer then failed to follow suicide-watch protocol because she became absorbed in other duties.  The Court also categorized the plaintiff's claims as based on an episodic act-or-omission theory of liability, not a conditions-of-confinement theory.  Here, Brittain stated that he did not have suicidal tendencies.  Even Nuss did not think Brittain was suicidal.  And Nuss alleges a claim based on conditions-of-confinement liability, which the Court in *Shepard* was not considering.  While understaffing may be a basis for section 1983 liability, it is not a basis for this conditions-of-confinement claim.

Nuss failed to offer any evidence which would show that the alleged understaffing amounted to more than a *de minimis* violation.  Brittain was the first and only arrestee held at the Seven Points police department who attempted suicide.  A single isolated incident "cannot prove that conditions of confinement are

---

[49] *Shepard v. Hansford Cnty.*, 110 F.Supp.3d 696 (N.D. Tex. 2015).

[50] [Doc. No. 62 at 27].

[51] *Shepard*, 110 F.Supp.3d at 703.

[52] *Id.*

constitutionally inadequate."[53]  Nuss failed to "demonstrate a pervasive pattern of serious deficiencies in providing for . . . basic human needs."[54]  Although Bee-Taylor was the only individual present for portions of the night, she maintained periodic checks on Brittain and summoned officers when he requested and when he needed assistance.  This evidence hardly demonstrates a deficiency in failing to provide for Brittain's basic human needs.   There is no genuine dispute of material fact showing that the conditions of confinement in the Seven Points police department constituted an unconstitutional condition of confinement.

*Suicide-restraint cell.*  Nuss argues that the failure to provide a suicide-restraint cell was "unconstitutional for a detainee like Brittain."[55]  By "a detainee like Brittain," the Court assumes Nuss is implying that Brittain was a detainee with a known risk of suicide, which Brittain was not.[56]  Nuss cites to *Jacobs v. West Feliciana Sheriff's Department*[57] to support the idea that the absence of a suicide-restraint cell was unconstitutional.  But that case involved a detainee who *did* have a known risk of suicide; just prior to her arrest, she tried to kill herself.  Here, Brittain did not have a known risk of suicide; he denied having suicidal tendencies when Gomez booked him. Seven Points' failure to provide a suicide-restraint cell, then, cannot be a deficiency in providing for Brittain's basic human needs.   At the time of his

---

[53] *Shepherd*, 591 F.3d at 454.

[54] *Id.*

[55] [Doc. No. 62 at 27].

[56] Again, even Nuss did not believe that Brittain was a suicide risk.

[57] *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000).

incarceration, there was no indication that he was at risk for suicide and needed special confinement to protect him. Failing to put him in a suicide restraint cell, when he had no known risk for suicide, cannot plausibly be a condition of confinement amounting to punishment. Therefore, there exists no genuine dispute of material fact regarding the existence of a constitutional violation with respect to the absence of a suicide-restraint cell.

***Failure to comply with jail standards***. Nuss argues that Seven Points is liable for failing to comply with Texas's jail standards. But Texas does not require that municipalities follow state standards for county jail standards, as Nuss admits.[58] Nuss cannot legitimately argue that Seven Points should be liable under section 1983 because it did not implement standards that Texas law specifically exempted it from implementing.

***Underfunding***. Finally, Nuss claims that the alleged underfunding of the Seven Points police department amounted to an unconstitutional condition of confinement. The Fifth Circuit has noted that "allegations of insufficient funding are . . . unavailing."[59] And importantly, budgeting decisions *do* have a reasonable relationship to a legitimate government interest.

---

[58] *See* [Doc. No. 55 at 27] ("[S]tate law did not require a municipal jail like Seven Points' jail to follow the jail standards . . . ."); Tex. Admin. Code § 251.1 (1997) (Tex. Comm'n. on Jail Standards, Authority) (explaining that the Commission's jurisdiction includes county jails, municipal jails operated under vendor contract, and county and municipal jails that house out-of-state inmates; Seven Points does not fall within any of these categories).

[59] *Shepherd*, 591 F.3d at 454.

***Claim 2: Episodic Act Liability***.  Episodic-act liability typically involves the interposition of an actor, like an employee, between the injured party and the municipal defendant.  To prevail on an "act or omission theory," Nuss must show "(1) that the municipal employee violated [the pretrial detainee's] constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal policy or custom adopted and maintained with objective deliberate indifference."[60]  As the voluminous discussion above demonstrates, none of the individual defendants violated Brittain's constitutional rights with subjective deliberate indifference.  Thus, the episodic-act analysis ends here.  There is no genuine dispute of material fact concerning whether Seven Points is liable on an "act or omission theory" because none of the individual defendants violated Brittain's constitutional rights.

***Claim 3: Failure to Train***.  "An inadequate training program or a failure to train 'may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom [the municipality] come[s] into contact.'"[61] Nuss argues that Seven Points' failure to conduct suicide training exposes it to section 1983 liability for failure to train.  The Fifth Circuit recognized in *Burns v. City of Galveston*, 905 F.2d 100 (5th Cir. 1990), however, that a municipality "need not train its officers to unerringly detect suicidal tendencies."[62]

---

[60] *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528–29 (5th Cir. 1999).

[61] *Shepard*, 110 F.Supp.3d at 716 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

[62] *Burns v. City of Galveston,* 905 F.2d 100, 104 (5th Cir. 1990).

Indeed, doing so would require "the skills of an experienced medical professional with psychiatric training, an ability beyond that required of the average police offer by the due process clause."[63]  That being said, a municipality must still "train its police officers to recognize and not ignore *obvious* medical needs."[64]

To hold Seven Points liable, Nuss must specifically show that: "(1) the training procedures of the municipality's policymaker were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury."[65]  No evidence has been offered to satisfy this standard.  Specifically, Nuss has not shown that the allegedly inadequate training directly caused Brittain's injury.  Even if the defendants had been given suicide-prevention training, Brittain denied having suicidal tendencies.

***Claim 4: Disabilities Act and Rehabilitation Act*.**  Nuss's final claim is that Seven Points is liable for violating the Disabilities Act and Rehabilitation Act. To prove a violation of the Disabilities Act and Rehabilitation Act, Nuss must show that: (1) Brittain was a qualified individual within the meaning of the Act; (2) he was excluded from participation in, or denied benefits of, services, programs, or activities for which Seven Points is responsible, or was otherwise discriminated against by Seven Points; and (3) such exclusion, denial of benefits, or discrimination was by

---

[63] *Id.*

[64] *Id.* (emphasis added).

[65] *Shepard*, 110 F.Supp.3d at 716.

reason of his disability.[66]  Because Nuss pled this claim as a failure-to-accommodate claim, she must also show that Seven Points knew Brittain's disability and limitations and failed to make reasonable accommodations.[67]

Nuss introduced evidence that Brittain had schizophrenia, a qualifying disability.  But Nuss has failed to offer evidence which shows that Seven Points knew Brittain's disability and limitations.  Brittain himself did not disclose that he had schizophrenia, and he requested no accommodation.  The only evidence that could have put Seven Points on notice was the phone call between Brittain's counselor and Officer Young, in which the counselor allegedly stated that Brittain might be suffering from mental health issues or schizophrenia.  There is no evidence that this was communicated as an affirmative diagnosis.  Officer Young stated in his affidavit that "[n]either Rachel or Brittain advised me at any time that he had been medically diagnosed with schizophrenia or any other mental illness."[68]  Because Brittain failed to request an accommodation, Nuss can only prevail on this claim if the "'disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents."[69]  That was not the case here.  Because the disability was not so obvious as to require an accommodation, Nuss cannot prevail on this claim.

---

[66] *Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 428 (5th Cir. 1997).

[67] *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015).

[68] Def.'s App'x. at 5.

[69] *Windham v. Harris Cnty.*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Taylor v. Principle Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

IV. Conclusion

For the foregoing reasons, the Court GRANTS the defendants' motions for summary and DISMISSES WITH PREJUDICE Nuss's claims.  A final judgment will follow shortly.

**IT IS SO ORDERED** this 21st day of October 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE